2021 IL App (2d) 191043-U
No. 2-19-1043
Order filed October 29, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| JUSTIN C. GARNHART, | ) | of Winnebago County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 17-D-41 |
| | ) | |
| MEGHAN M. GARNHART, | ) | Honorable |
| | ) | Ronald A. Barch, |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hudson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion when it ordered respondent-appellant to undergo a drug and alcohol abuse assessment and treatment, if necessary, as a prerequisite to modifying its order limiting her to supervised parenting time. The trial court also did not abuse its discretion when it admitted into evidence certain of respondent-appellant's social media posts presented by the guardian *ad litem* which had not been disclosed in discovery because they were made subsequent to the trial's commencement. Therefore, we affirm.

¶ 2    Following a three day hearing on the allocation of parental responsibilities and parenting time for the parties' two children, the trial court awarded sole decision-making authority to petitioner-appellee Justin C. Garnhart. The trial court also found that respondent-appellant Meghan

M. Garnhart had engaged in conduct which seriously endangered the children's mental, moral, and emotional health, and it restricted Meghan's parenting time to supervised time pursuant to section 603.10(a) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/603.10(a) (West 2018)). As part of its decision, the trial court also required Meghan to, *inter alia*, undergo an assessment and, if necessary, treatment for drug and alcohol abuse before she could seek unsupervised parenting time. On appeal, Meghan argues that the trial court abused its discretion when it admitted certain social media posts into evidence and when it ordered her to undergo an evaluation and treatment for drug abuse. We affirm

¶ 3                                    I. BACKGROUND

¶ 4                          Relevant Procedural History

¶ 5      On January 17, 2017, Justin filed a petition for dissolution of the parties' marriage. On February 15, 2017, Justin filed a petition for an emergency order of protection against Meghan, alleging that she assaulted him and complaining of her hysterical conduct in front of their children. His request was granted. That same day, Meghan was arrested and charged with obstructing service of process of the order of protection, a Class B misdemeanor, to which she pled guilty in exchange for 12 months of court supervision.

¶ 6      On February 23, 2017, the trial court modified the February 15, 2017, order of protection by removing the children as parties and by adding a provision preventing the parties from discussing the divorce proceedings with or disparaging one another to the children.

¶ 7      On March 2, 2017, a temporary agreed order was entered which set a parenting schedule, ordered the parties to attend co-parenting classes, limited communication between the parties to text messages, and vacated the emergency order of protection.

¶ 8      On April 19, 2017, an order was entered which, *inter alia*, prohibited the parties from

making disparaging remarks to each other in front of the children.

¶ 9 On August 9, 2017, at the request of an individual who is not a party to this litigation, an emergency stalking no contact order was entered against Meghan. On August 10, 2017, Meghan was arrested for violation of that order after she sent a text message to the individual after being served with the order. Meghan pled guilty to a Class A misdemeanor charge for violating that order in exchange for 12 months of court supervision.

¶ 10 On November 21, 2017, Justin filed a petition for temporary relief based upon Meghan texting and calling him hundreds of times in violation of the March 2, 2017, order and her discussing the litigation with the children and disparaging him in front of them.

¶ 11 On January 23, 2018, a supplemental order was entered which limited the parties' communication to Our Family Wizard,[1] prohibited them from speaking to each other during exchanges, and placed restrictions on phone conversations with the children during the other's parenting time.

¶ 12 On March 26, 2018, Meghan was arrested and charged with a Class 3 felony for aggravated assault against Justin's step-father, Mark Lotzer, for which she was tried and found not guilty. Based in part upon the alleged assault, Justin filed a second petition for an emergency order of

---

[1] Our Family Wizard is an application designed to promote better communication between divorced or divorcing parents. It is a tool to help parents communicate, schedule custody, and enter specific appointments for their children. It allows the parents to send messages to each other about what the children are or should be doing during the week and provides a contemporaneous record of those communications. Barry D. Bayer, *Better Searching, and Matrimonial Communication on the Web*, LAW OFFICE TECHNOLOGY REVIEW, Nov. 14, 2001, 2001 WL 1829161.

protection against Meghan. Justin's request was granted and the trial court suspended Meghan's parenting time pending further order of court.

¶ 13    On April 9, 2018, another agreed temporary order was entered which suspended Meghan's parenting time and limited her contact with the children to phone calls initiated by the children. It also provided that Justin could monitor and record the phone calls and that he could terminate them if Meghan began discussing the proceedings or using foul language.

¶ 14    On April 19, 2018, Meghan filed a petition to restore her parenting time. On April 30, 2018, Justin filed a petition requesting that Meghan's parenting time be supervised and that exchanges take place at Safe Harbor.

¶ 15    On May 16, 2018, after conducting an evidentiary hearing, the trial court entered an order granting Meghan supervised parenting time, and which again barred the parties from discussing the case or one another with the children. On July 3, 2018, an order was entered which provided for the transition from supervised to unsupervised parenting time for Meghan and again barred the parties from discussing the case or one another with the children. On August 14, 2018, an order was entered allowing unsupervised parenting time for Meghan.

¶ 16    On September 14, 2018, the trial court issued a rule to show cause against both parties based on allegations that they had been discussing the case with and making disparaging comments about each other to the children.

¶ 17    On December 14, 2018, Justin filed a petition to place Meghan back on supervised parenting time based on her violation of the orders prohibiting discussion of the case and disparaging Justin towards the children. On December 19, 2018, an order was entered suspending Meghan's unsupervised parenting time and phone communications with the children.

¶ 18    On February 1, 2019, an order was entered vacating the rule to show cause against Justin

and finding Meghan in contempt for violating the trial court's previous orders. The trial court entered a stayed sentence of 12 days in jail which she could purge by complying with the trial court's orders in the future.

¶ 19    On February 26, 2019, a temporary order was entered providing a schedule for supervised parenting for Meghan and allowing for scheduled phone calls between the children and Meghan. Justin had the right to monitor, record, and terminate the phone calls if Meghan discussed any prohibited subjects.

¶ 20    On March 5, 2019, Meghan filed a motion to modify parenting time, requesting *inter alia* that she have unsupervised parenting time with the children. Following a hearing on April 23, 2019, the trial court granted Meghan unsupervised parenting time on May 3, 2019. On May 6, 2019, Justin moved to reconsider and to vacate the May 3, 2019, order on the basis that Meghan had violated the trial court's orders regarding discussing the case with the children between the April 23, 2019, hearing and the trial court's May 3, 2019, order.

¶ 21    On May 22, 2019, an order was entered once again finding Meghan in contempt for violating the trial court's orders regarding communication with the children and restricting Meghan's parenting time to supervised visits.

¶ 22    An evidentiary hearing was held regarding the parties' allocation of parental responsibilities on June 12, June 14, and July 2, 2019. Between the second and third day of trial, a plenary order of protection was entered against Meghan in favor of Justin, with the trial court entering an addendum to the plenary order of protection on July 2, 2019.

¶ 23    On July 24, 2019, the trial court entered a memorandum of decision indicating it would enter a judgment assigning all parental decision-making responsibilities to Justin. Consistent with the memorandum of judgment, on August 22, 2019, a corresponding parenting plan order was

entered. On September 23, 2019, Meghan filed a motion to reconsider the trial court's August 22, 2019, parenting plan order, and the related memorandum of decision. On November 25, 2019, the trial court denied Meghan's motion to reconsider, and she timely appealed.

¶ 24                                  Hearing and Other Evidence

¶ 25    To begin, we note that in rendering its decision, the trial court made reference to and explicitly incorporated factual findings from related proceedings which have not been included in the record on appeal. "[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). "[A]ny doubts that may arise from the incompleteness of the record will be resolved against the appellant." *In re Linda B.*, 2017 IL 119392, ¶ 43. Accordingly, we will presume that those factual findings were supported by the evidence and would support the trial court's decision.

¶ 26    Justin and Meghan were married on October 28, 2006. There were two children born to the parties; M.G., born March 6, 2007, and S.G., born April 28, 2011. Additionally, Meghan had another child, N.B., as the result of a prior dating relationship with a man named Steve Baxter. Prior to the breakdown of the parties' marriage, N.B. lived with Justin and Meghan.

¶ 27    On December 6, 2016, Meghan moved out of the parties' marital home and began living at one of her family's rental properties. She returned to the marital home on December 29, 2016, against the wishes of Justin before eventually moving out again. By all accounts, prior to the breakdown of the marriage, Justin and Meghan were able to effectively co-parent. Likewise, Steve Baxter testified that he and Meghan were able to co-parent N.B. amicably. However, almost immediately after Meghan moved out, the parties' ability to communicate began to deteriorate.

¶ 28　Throughout this period until the entry of an order of protection prohibiting communication with Justin, and even after that, Meghan would bombard him with a constant stream of text messages and phone calls in rapid succession, sometimes sending several texts per minute. Justin would sometimes receive hundreds of texts or calls a day. The messages were profanity laden and would frequently insult Justin's appearance, manhood, and abilities as a father and husband. Meghan would alternate between insulting him and pleading with him to reconcile with her. She would also make disparaging remarks about Justin's mother, step-father, and other family members, and at least once made racist remarks regarding Justin's counsel. Justin would usually not respond, or sometimes reply with brief messages asking her to stop. Meghan would also make veiled and overt suicidal threats in her text messages to Justin, including times when she had the children. During one incident on September 6, 2017, Justin felt concerned enough to call the police to perform a welfare check.

¶ 29　A similar barrage of communications was likewise directed towards several other persons in the litigation including the guardian *ad litem* (GAL), Justin's counsel, Meghan's counsel, and the children's counselor, Elise Cadigan.

¶ 30　Eventually the parties came to a parenting schedule. However, Meghan would frequently interfere with Justin's parenting time or use the exchanges to alternatively beg Justin to reconcile, insult him, or try to negotiate aspects of the divorce. During these instances she would often cry and yell hysterically and had no reservations about berating Justin in front of the children, who were often left crying and upset by her behavior. In a noteworthy incident on May 30, 2017, Meghan delayed returning the children to Justin by seven hours, and when he arrived to pick them up, she wedged her arm in between the window of his car, preventing him from closing it, before forcing her way into the passenger seat of his vehicle. In another incident on July 8, 2017, while

Justin was home with the girls, she entered the home without permission, made sexual advances towards him, threatened suicide, and then climbed onto the roof where she sat crying. On October 29, 2017, during an exchange, as Justin began to leave after picking up the children, Meghan ran over to prevent him from entering his vehicle. This caused them to come into contact as he tried to enter the vehicle. At which point she screamed, "Daddy is trying to hurt mommy." Justin estimated the Meghan interrupted between 10 and 20 exchanges.

¶ 31     During his parenting time, if he was busy, Justin would sometimes leave the children with his mother and step-father. Prior to the parties' separation, Justin's parents would often pick the children up from school on the days Justin and Meghan were busy. Mark Lotzer and Justin's mother, Sandy Lotzer, testified about how Meghan would interrupt the children's time with their grandparents by showing up wherever they were, causing a scene, and demanding that the grandparents surrender the children to her. While one instance occurred at the grandparents' home, these confrontations often took place in public in front of the children's peers with incidents occurring at the Cherryvale Mall, M.G.'s school, and S.G.'s gymnastics school. These incidents occurred between January 2017 and February 2018.

¶ 32     While there was no suggestion that Meghan physically abused the children, there were instances of violence directed towards Justin and his step-father. The trial court found by a preponderance of the evidence that, on February 15, 2017, Meghan threw a basket at Justin, which hit a wall and broke into pieces within a few feet of him. She then proceeded to punch him multiple times in the torso and strike him in the head. Additionally, though she was found not guilty in a related criminal case, the trial court found by a preponderance of the evidence that she had assaulted Mark Lotzer by shoving him, punching him in the face, and knocking off his glasses. Though Meghan denied that this occurred, Justin and Mark Lotzer testified to it and provided the

trial court with a photograph of Mr. Lotzer's injured face. This incident occurred on March 26, 2018, at the marital home when Meghan was supposed to be picking up some of her possessions.

¶ 33    As a result of Meghan's assault on Mark Lotzer, her parenting time was suspended from March 26 to May 16, 2018. From May 16, 2018, onward Meghan had supervised parenting time, except for the period of August 14 to December 19, 2018, where she exercised unsupervised parenting time.

¶ 34    Meghan was also allowed to speak to the children over the phone. Initially, the children could call her whenever they wanted, but Meghan began to pressure them about the frequency of their calls, and the calls had to be placed on a schedule. Because of the way Meghan would act during the calls, Justin received permission to monitor, record, and, if necessary, terminate the phone calls.

¶ 35    During these phone calls Meghan would sometimes try to discuss the case with the children or disparage Justin. On some occasions Meghan would break down crying, which made the children upset. There were several recorded phone calls where the children are either crying or asking Meghan not to talk about the litigation. In one phone call recorded on November 25, 2018, the children can be heard crying and pleading to end the phone call as Meghan accuses Justin of trying to stand in the way of her relationship with them.

¶ 36    With regard to supervised parenting time, the reports from supervisor Patrice Turner were generally positive, however, Meghan would occasionally try to discuss the proceedings with the children and have to be steered away from the topic. The GAL reported that M.G. had said that Meghan just cried during the Safe Harbor visits and would not play games with them.

¶ 37    Unsupervised parenting time was another matter. The GAL testified that the children told her that during her unsupervised parenting time Meghan would slam or pretend to slam her arm in

the door to get attention. She would also involve the children in asking Justin for more time and try to change the plans, despite the schedule being set by court order. Meghan would accuse Justin of divorcing her at the same time her mother died to make her feel bad. The children also reported that Meghan would call Justin's girlfriend a f***ing b****. She also called Justin's mother and sister a f***ing b*** during unsupervised visits. The children reported that Meghan would cry when she was alone with them and lament about how no one loved her and everyone forgot her. She would also pressure them to call her, and when the children responded by asking about the schedule, she told them she did not care what the judge said. The children also reported that she would try to get the children to say that Justin was telling them to say bad things about her, and get them to say bad things about him.

¶ 38    The GAL also reported that when the trial court had ordered that unsupervised parenting time would resume, the children had expressed dread, with M.G. reporting having diarrhea at the very prospect. When they were told that unsupervised visits would not be happening, they both expressed relief.

¶ 39    Over the course of the litigation, Meghan repeatedly violated the trial court's orders. Particularly, she violated its orders relating to communications with Justin and its prohibitions on discussing the litigation with or disparaging Justin to the girls. At trial Meghan testified that she was embarrassed by her behavior and that she was now over Justin. However, as late as June 5, 2019, the trial court found that she was still making phone calls to Justin in violation of the order of protection. As recently as April 23, 2019, she was recorded discussing the litigation with the children.

¶ 40    Further, between the second and third days of the hearing, Meghan sent Facebook messages to Justin's girlfriend inviting her to join a Pinterest board calling her *inter alia* a "skank" and a

"homewrecker." The board also contained a post saying, "Sorry you can't adopt my kids too… don't you have enough already?" Meghan claimed that these messages were sent weeks before and not during the trial. The trial court found that any improvement in Meghan's behavior was more attributable to the trial court's orders rather than any personal growth.

¶ 41    Ultimately the trial court found that Meghan's conduct seriously endangered the mental, moral, and emotional health of the children. At the recommendation of the GAL, it granted sole decision-making responsibilities to Justin and ordered that Meghan's parenting time would be restricted to supervised parenting time and monitored phone calls. The trial court concluded its order with the following:

> "Ms. Garnhart would be well-served by undergoing an assessment for substance abuse, anger issues and mental health concerns. The trial court will consider a motion to modify once Ms. Garnhart is able to establish that she has been evaluated in all three areas and has completed and recommended treatment and counseling. Ultimately, modification of the parental restrictions will remain available as governed by 750 ILCS 5/603.10(b)."

¶ 42    Meghan timely appealed.

¶ 43                                              II. ANALYSIS

¶ 44    At issue in this appeal is whether the trial court abused its discretion in ordering Meghan to undergo evaluation and, if necessary, treatment for drug and alcohol abuse before it would consider modifying the parenting order to include unsupervised visits. Also at issue is whether the trial court erred in admitting social media posts from Meghan disparaging Justin's girlfriend.

¶ 45                                           Drug Assessment

¶ 46    Meghan argues that the trial court abused its discretion in ordering her to undergo an evaluation for drug and alcohol abuse where there was no evidence presented that Meghan was

abusing drugs and there was very little evidence of alcohol abuse. Meghan also takes issue with the fact that the trial court did not outline the scope of the evaluation or which types of drugs she was to be evaluated for. Meghan does not cite any caselaw in support of her argument. We note, however, that section 603.10 of the Illinois Marriage and Dissolution of Marriage Act, which authorizes the court to place restrictions on parental responsibilities if it finds that a parent's conduct endangers the child's mental, moral, or physical health, has only been in place since January 1, 2016, and replaces the now repealed section 607 (750 ILCS 5/607 (West 2014). *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 56. The previous statute did not include a provision which specifically allowed the courts to order a parent to undergo treatment for drug or alcohol abuse. See 750 ILCS 5/603.10(a)(8) (West 2018). There is no caselaw which specifically addresses section 603.10(a)(8).

¶ 47     Once the trial court has determined that a parent has engaged in conduct that "seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development," it must use its discretion to apply appropriate restrictions to parenting responsibilities in order to provide for the child's safety and welfare. 750 ILCS 5/603.10(a) (West 2018). Accordingly, we review the trial court's order requiring Meghan to undergo an assessment and, if necessary, treatment for drug and alcohol abuse for an abuse of discretion. *Mayes*, 2018 IL App (4th) 180149, ¶ 58. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 48     While we agree with Meghan that there was no direct evidence of drug abuse, we do not find that the trial court abused its discretion in ordering an assessment for drug and alcohol abuse. By all accounts the breakdown of Meghan and Justin's marriage led to a dramatic and severe shift

in her behavior. Meghan's friends and family testified that she was a loving and caring mother. Justin acknowledged that prior to the breakdown of the marriage, he and Meghan were able to effectively co-parent their children and did not describe any misconduct of the type which led to the entry of the court's order. Likewise, Steve Baxter testified that he and Meghan were able to effectively co-parent N.B. without any of the issues exhibited in the instant case.

¶ 49     Ultimately, no satisfactory explanation for Meghan's behavior was ever found. Several explanations were posited by the GAL such as bipolar disorder, borderline personality disorder, and narcissistic personality disorder. However, the GAL was not a trained psychologist, and these explanations were therefore speculative. Meghan testified that she was taking medication for depression. With regard to alcohol abuse, Justin testified that during the incident in which Meghan forced herself into his car he could smell "booze" on her breath. The GAL testified that as it got later in the day, Meghan's messages to her would become angrier, would use more improper language, and would contain more errors. She believed this was indicative of alcohol use. The GAL also testified that Elise Cadigan had expressed concerns regarding Meghan abusing alcohol. As such, the GAL recommended that Meghan undergo an alcohol or substance abuse assessment.

¶ 50     While there was nothing that indicated an issue with drug abuse *per se*, in light of the fact that there was some indication of alcohol abuse and the unexplained dramatic shift in Meghan's personality and behavior, we cannot say that the trial court's decision was arbitrary, fanciful, or unreasonable. Accordingly, we find that the trial court did not abuse its discretion.

¶ 51                          Social Media Evidence

¶ 52     Meghan argues that the trial court abused its discretion when it accepted evidence of social media posts presented by the GAL after the discovery cutoff date. Meghan argues that while GALs may consider evidence in creating their reports which is otherwise inadmissible, the trial court

should not have considered the evidence in this case because it created undue surprise for Meghan, and that surprise impeded the ability of trial counsel to cross-examine the GAL. Meghan also takes issue with the fact that the social media posts were provided to the GAL by Justin's counsel who received them from Justin's girlfriend, and claims that Justin engaged in gamesmanship.

¶ 53 Meghan further maintains that the trial court's consideration of this evidence was prejudicial to her as one of the primary concerns was whether her behavior was improving, and this evidence tended to indicate that it had not. Meghan also notes that the trial court discussed the social media posts both in issuing its initial memorandum and in the hearing on Meghan's motion to reconsider.

¶ 54 Justin argues that both parties had the social media posts prior to the GAL's testimony, Meghan was given the opportunity to cross-examine the GAL regarding the posts but chose not to, and Meghan indicated there would be no objection to the exhibit if the dates of the posts could be corroborated.

¶ 55 "It is within the discretion of the circuit court to decide whether evidence is relevant and admissible, and a reviewing court will not disturb the circuit court's decision absent a clear abuse of that discretion." *Peach v. McGovern*, 2019 IL 123156, ¶ 25. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Collins*, 2015 IL 118432, ¶ 41. An erroneous ruling on the admissibility of evidence is harmless where the result reached is not affected by the ruling, and it is the burden of the party seeking reversal of a trial court's evidentiary ruling to establish prejudice. *Atkins v. Thapedi*, 166 Ill. App. 3d 471, 477 (1988).

¶ 56 In performing their duty, GALs are permitted to consider both admissible and inadmissible evidence. *In re Marriage of Karonis*, 296 Ill. App. 3d 86, 91 (1998). Where a party has the

opportunity to cross-examine a GAL regarding a particular exhibit but fails to do so, they cannot later claim to have been prejudiced. *Id.* Meghan claimed that the social media posts were made "much, much earlier" than when Justin's girlfriend claimed but did not cross-examine the GAL on the posts. Further, at the close of trial, Meghan indicated that if Justin's counsel provided date and time stamps for the social media posts that indicated they were made during the testified time period, there would be no objection to the posts. Additionally, the trial court afforded the parties an opportunity to submit written arguments regarding the admissibility of the posts. The record does not indicate whether Meghan was provided with time and date stamped copies, or if either party submitted further arguments on the issue.

¶ 57    However, because Meghan was provided with copies of the posts prior to the GAL's testimony, given the opportunity to cross-examine the GAL, and permitted to submit further written arguments against the admission of the posts, Meghan cannot claim that she was prejudiced or surprised by the admission of the posts. *Id.*; *Banks v. United Insurance Co. of America*, 28 Ill. App. 3d 60, 64 (1975) (surprise can be cured by a continuance).

¶ 58    Even assuming *arguendo* that the trial court erred in admitting the social media posts, we cannot say that the admission of the social media posts affected the outcome of the case in light of the overwhelming evidence supporting that Meghan endangered the mental, moral, and emotional health of the children. The GAL testified that she had four boxes of problematic communications from Meghan to various persons and that were she to present all her concerns in full, it would take two weeks. The GAL also testified that Meghan had violated the majority of the trial court's orders in the case, if not all of them. In rendering its decision, the trial court incorporated by reference the factual findings of three prior orders against Meghan and still felt the need to emphasize that its analysis contained "only highlights of the material evidence and testimony." " 'Where it appears

that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed.' " *J.L. Simmons Co., Inc. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.*, 108 Ill. 2d 106, 115 (1985) (quoting *Both v. Nelson*, 31 Ill. 2d 511, 514 (1964)). While the trial court did discuss the social media posts in its memorandum and at the hearing on Meghan's motion to reconsider, in light of the overwhelming evidence on which the trial court based its decision, we cannot say that the trial court's decision would have been any different without them.

¶ 59    Accordingly, the trial court did not abuse its discretion in admitting the social media posts.

¶ 60                                    III. CONCLUSION

¶ 61    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 62    Affirmed.