Rule 23 order filed
September 2, 2022.
Motion to publish granted
October 4, 2022.

2022 IL App (5th) 220213

NO. 5-22-0213

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| JACOB SADLER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 19-F-28 |
| | ) | |
| SAMANTHA PULLIAM, | ) | Honorable |
| | ) | Timothy D. Denny, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court, with opinion.
Justices Welch and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent, Samantha Pulliam (Sam), appeals from the judgment of the circuit court of Union County awarding joint decision-making and equal parenting time to her and petitioner, Jacob Sadler, with regard to their minor child, W.P. We reverse and remand.

¶ 2                                     I. Background

¶ 3        The parties never married. On February 3, 2019, their daughter, W.P., was born.

¶ 4        On August 23, 2019, Jacob filed a petition to establish parentage and parental responsibility. On September 19, 2019, Sam filed an answer to Jacob's petition to establish parentage and parental responsibility. On January 14, 2020, Jacob filed a motion for DNA testing, which the circuit court granted. On June 30, 2020, the parties entered into an agreed order to attend mediation to resolve the pending matters concerning W.P.

1

¶ 5     On September 11, 2020, the mediator filed its report. The report indicated that mediation was not held because an "impediment was found to exist." A docket entry from November 2, 2020, indicated that Sam experienced health issues that interfered with the mediation.

¶ 6     On January 19, 2021, Jacob filed a motion for temporary parenting time. On April 19, 2021, the circuit court ordered the parties to tender a temporary parenting time order. The court ordered the parties to schedule mediation by June 7, 2021, the date of the next hearing.

¶ 7     On May 20, 2021, Jacob filed a motion requesting the circuit court order mediation for the parties. The next day, the court ordered the parties to complete mediation within 60 days.

¶ 8     On June 7, 2021, and August 2, 2021, the circuit court ordered the parties to schedule and complete mediation. On October 4, 2021, the court ordered the parties to complete mediation by October 18, 2021. Shortly thereafter, the mediator filed a report. The report concluded that mediation ended without agreement between the parties on the allocation of parental responsibilities and parenting time.

¶ 9     On October 18, 2021, the circuit court held a case management conference. A docket entry in the common law record on appeal indicated the following: "Mediation has failed. *** Parties reach agreement. Agreement is for weekly increase in parenting time for petitioner [Jacob] over next 7 weeks. [B]oth parties verbally affirm their agreement in open court. Parties to submit order." The common law record on appeal does not contain a court order or transcript of the proceedings from this hearing, and the docket entry does not state the details of Jacob's increased parenting time.[1]

---

[1]Sam's brief states that the parties agreed to Jacob receiving unsupervised parenting time starting with two hours, twice a week, and then progressing to eight hours, twice a week. In addition, Jacob's March 3, 2022, petition for rule to show cause states the parties agreed to a phased-in parenting time schedule, with Jacob eventually receiving eight hours of parenting time two days a week on his days off of work.

¶ 10     On January 27, 2022, Jacob filed a "Statement of Contested Issues," seeking equal parenting time and joint decision-making. Jacob requested a "two-two-three" rotating parenting schedule, with the parties alternating holidays and each party receiving two nonconsecutive, uninterrupted weeks in the summer. Jacob also attached his income statements from 2019 and 2020 for child support calculation purposes. Additionally, Jacob filed a proposed judgment of allocation of parental responsibilities, requesting that the circuit court award equal parenting responsibilities, including decision-making responsibilities and parenting time.

¶ 11     That same day, Sam filed a pretrial memorandum that included her proposed parenting plan and child support calculations. Sam requested the circuit court grant her sole decision-making responsibilities on all significant decisions regarding W.P.'s education, healthcare treatment, educational choices, and extracurricular activities. Sam also requested that the court award her majority parenting time. Sam proposed that Jacob have regular parenting time every other weekend from 9 a.m. to 6 p.m. on Saturday and from 9 a.m. to 6 p.m. on Sunday, until W.P. was 10 years old. After W.P.'s tenth birthday, Sam proposed that Jacob have W.P. every other weekend from Saturday at 9 a.m. until Sunday at 6 p.m. Sam also proposed that Jacob have parenting time with W.P. every year from 9 a.m. to 6 p.m. on Father's Day, the day after Thanksgiving, and the day after Christmas. Moreover, Sam claimed that Jacob never paid child support and requested retroactive child support payments dating back to W.P.'s birth on February 3, 2019, in the sum of $25,433.06.

¶ 12     On February 7, 2022, the circuit court held a case management conference. The docket entry states: "Prior temporary order is in effect until further order of the court."[2]

---

[2]There is no report of proceedings contained in the record on appeal.

¶ 13    On March 3, 2022, Jacob filed a petition for rule to show cause, alleging Sam violated the circuit court's October 18, 2021, order when she refused to allow Jacob to see W.P. after the February 7, 2022, hearing. According to Jacob, on February 7, 2022, the court ordered the parties to continue the court's previous parenting time arrangement from October 18, 2021. According to Jacob, "[t]he parties previously announced to the Court and in fact implemented a phased in parenting time schedule that concluded with the father receiving eight (8) hours of parenting time on each of his two days off per week." Jacob argued, however, that Sam refused Jacob parenting time because "[W.P.] has a broken leg and is under doctors' orders not to move the leg more than necessary." Jacob also argued that Sam failed to provide the court with testimony or medical records that Jacob could not exercise his parenting time due to W.P.'s broken leg.

¶ 14    On March 4, 2022, Sam filed a motion to dismiss Jacob's petition for rule to show cause based on his failure to comply with Local Rule 4.2 of the First Judicial Circuit (1st Judicial Cir. Ct. R. 4.2 (Dec. 12, 1991)) and Illinois Supreme Court Rule 191 (eff. Jan. 4, 2013). Several days later, Sam filed a second motion to dismiss, arguing, first, that Jacob failed to comply with Local Rule 4.3 of the First Judicial Circuit (1st Judicial Cir. Ct. R. 4.3 (Jan. 11, 2019)), and second, that a court order was never entered awarding Jacob increased parenting time on October 18, 2021, thus, she could not be held in contempt of court.

¶ 15    On March 11, 2022, the circuit court held a bench trial on Jacob's petition to establish parentage and parental responsibility. From the outset, the court, in referencing Jacob's petition for rule to show cause and Sam's motions to dismiss, stated that it "prefer[red] to move on to the merits before we deal with the other issues." As such, the court heard testimony and argument on Jacob's petition. After opening statements, the following testimony was adduced.

¶ 16                                    A. Jacob Sadler

¶ 17    Jacob testified to the following. Jacob lived in Karnak, Illinois, with his girlfriend of four years, Chelsea Ruffo, and her two minor children, who lived with the couple 50% of the time. Jacob's parents, brother, sister-in-law, and their five minor children lived in close proximity to Jacob to help care for W.P. Jacob explained that he "backed away" from Sam after she announced her pregnancy and before W.P.'s birth, but he met W.P. two or three days after she was born. Even though a paternity test confirmed he was W.P.'s father, Sam denied him parenting time on several occasions. Jacob initially engaged in supervised visits with W.P. at his parents' house, Sam's house, or at a park near Sam's house. After some time, however, Sam agreed to a "graduated-type schedule of visitation," where Jacob would "build up" unsupervised time with W.P., starting with two hours and progressing to eight hours per visit.

¶ 18    On January 15, 2022, W.P. fell on a trampoline at Vertical Jump in Paducah, Kentucky, with Jacob, Chelsea, and Chelsea's minor children. After the fall, W.P. was unable to walk. Jacob initially thought W.P. sprained her ankle, so he carried her to the lounge area, messaged Sam, and applied ice to her injury. Despite this, W.P.'s leg swelled. After it was clear that W.P. was in pain, Jacob messaged Sam requesting her to meet at a hospital. Jacob drove W.P. to Sam's house around 6:30 p.m. that evening. According to Jacob, Sam took W.P. to the hospital without him, and she did not contact him until 9 p.m., at which time he learned that W.P. broke two bones in her leg.

¶ 19    Jacob testified that Sam withheld parenting time after W.P. broke her leg on January 15, 2022, which violated the circuit court's October 18, 2021, order. Jacob's attorney stated that Jacob would stipulate to the court's October 18, 2021, docket entry. Sam's attorney, however, asked the court to clarify the specifics of the court's docket entry, provided there was substantial discussion at the hearing that day. The court responded that an agreed temporary order was entered on October

5

18, 2021, however, the order was "not in my record." To the court's knowledge, Sam was to provide the "medical records *** so the Petitioner understood the doctor had indicated what restrictions are and the Court would as well." Sam's attorney objected to classifying the parties' agreement as an order, because the parties never submitted, and the court never entered, such order. The court indicated that it would "certainly consider [the] parties' prior conduct before me as a credibility issue at the very least in the underlying issue, whether or not I accept what they're telling me to be the truth." Jacob clarified that Sam did not provide documentation demonstrating Jacob could not care for W.P.'s broken leg.

¶ 20 As it related to Jacob's proposed judgment of allocation of parental responsibilities, he requested joint decision-making and equal parenting time, based on a two-two-three rotating schedule. Jacob worked in Anna, Illinois, at Choate Mental Health and Developmental Center (Choate), which was near Sam's house. His schedule varied, and he often worked overtime. W.P. enjoyed spending time with Chelsea's children and Jacob's family. Jacob said there were times when he did not see W.P. for over a month, including in the fall of 2021 when Sam withheld Jacob's parenting time.

¶ 21 On cross-examination, Jacob admitted that he blocked Sam on Facebook while she was pregnant, although he denied that he blocked her cell phone number. Jacob acknowledged that Sam asked him to provide a blood draw when W.P. had medical issues in utero and admitted that he did not comply. Jacob also admitted that he was not present at W.P.'s birth, although he maintained that Sam could have texted him that day. Jacob claimed that he changed W.P.'s diapers, dressed her in proper clothing, and desired to have a relationship with her. He denied that Chelsea pressured him to parent and have a relationship with W.P.

6

¶ 22 With regard to W.P.'s accident on January 15, 2022, Jacob texted Sam 2½ hours after W.P. fell, indicating that W.P. needed to see a doctor. Jacob admitted that he drove past three hospitals from Paducah, Kentucky, to Sam's home in Anna, Illinois, following W.P.'s injury. Initially, Jacob believed W.P. sprained her ankle, so he applied an ice pack. Between 5:15 p.m. and 5:30 p.m., Jacob contacted Sam, because W.P.'s pain seemed worse. Jacob admitted that he asked the police to perform a wellness check sometime after 11 p.m., even though Sam texted him that W.P. was asleep in bed. Jacob admitted that Sam offered him visits with W.P. at Sam's home or via FaceTime after W.P. broke her leg; however, he declined. Jacob acknowledged that he went to W.P.'s second doctor's appointment, and that he was aware that W.P. broke her tibia and fibula. Jacob denied that Sam offered him parenting time via FaceTime on Valentine's Day, because Sam took W.P. to dinner and a movie.

¶ 23                         B. Chelsea Ruffo Bosecker

¶ 24 Chelsea testified to the following. Chelsea and Jacob lived together with her minor children, who resided in their home 50% of the time. According to Chelsea, Jacob never neglected or abused her children. Chelsea was able to care for W.P. when needed, especially when Jacob worked. She believed W.P. and Jacob had a good relationship, and that W.P. enjoyed spending time with Chelsea's children.

¶ 25                         C. Andrew Trambley

¶ 26 Andrew, Sam's boyfriend, testified to the following. According to Andrew, Jacob actively engaged with W.P. during his parenting time, although W.P. appeared timid when she left Sam and eager to get home to her. When Jacob started to receive unsupervised visits, W.P.'s diaper was dirty when she came home. Under the belief Jacob did not change W.P.'s diapers, Sam placed a

7

mark on W.P.'s diaper before she left for a visit with Jacob. Hours later, W.P. returned home in the same diaper. Also, Jacob did not dress W.P. in appropriate clothing in cold weather at times.

¶ 27                                    D. Sam Pulliam

¶ 28    Sam testified to the following. Jacob was not involved in Sam's pregnancy after he learned of W.P.'s potential health issues at 12 weeks. Jacob started dating Chelsea during this time and blocked Sam's phone number. Sam felt abandoned by Jacob, especially given W.P.'s complications during pregnancy. Specifically, W.P. tested positive for "an antibody that was attacking her blood and her brain." Sam contacted Jacob several times, requesting him to have a blood test. Even though Sam's insurance paid for the blood test, Jacob never responded. Jacob was not present at W.P.'s birth. Sam admitted that she did not contact him that day, because Jacob blocked her. Sam felt Jacob petitioned for paternity and parentage because he felt pressured by his family and Chelsea. Sam initially allowed Jacob to see W.P. at her house and at a local park in Anna, Illinois. Sam believed co-parenting counseling would be beneficial to work through communication issues, but Jacob attended only one session because "he didn't need it."

¶ 29    Before the October 18, 2021, temporary schedule, Jacob was attentive with W.P., and W.P. bonded with her dad. Jacob started unsupervised visits in October 2021. There were several times that W.P. had serious illnesses—RSV, hand, foot, and mouth disease, and Covid. During these times, Sam rescheduled Jacob's parenting time, but Jacob "demanded" that he see W.P. Sam also rescheduled his parenting time when she heard that one of Chelsea's children had a staph infection with open blisters. Each time, Sam offered Jacob to see W.P. via FaceTime. After unsupervised visits started, Jacob dropped W.P. off "[a]lmost every time at the beginning" with urine-soaked diapers. With the belief that Jacob did not change W.P.'s diapers, Sam placed a mark on the outside of W.P.'s diaper before W.P. left for a visit with Jacob. Sam testified that W.P. returned that day

8

with the same diaper on after a six-hour visit. Additionally, W.P. often wore different clothes when she returned home after visits with Jacob, with pee-soaked pants in a bag. On another occasion, W.P. wore a thin shirt without shoes or a coat when it was 14 degrees outside.

¶ 30 Shortly before January 15, 2022, Sam considered overnight parenting time, especially since W.P. was "getting comfortable" with Jacob and his family. On January 15, 2022, at 4:09 p.m., however, Jacob texted Sam that W.P. fell and hurt her ankle. Shortly thereafter, Jacob informed Sam that W.P. walked on her ankle and that she was okay. Approximately 10 minutes later, Jacob informed Sam that W.P. was asleep. At 5:54 p.m., Jacob texted Sam that he was on his way to Sam's house with W.P. While he drove to Sam's house, Jacob FaceTimed Sam "trying to show [Sam to W.P.]," who screamed and cried on the call. At that time, Jacob suggested they take W.P. to a doctor together. When Jacob arrived at Sam's house at approximately 7 p.m., W.P. did not move her foot. Sam, accompanied by Andrew and her mother, drove W.P. to Cape Girardeau, Missouri, for medical care, because, based on past experience, the hospital near her home was inadequate.

¶ 31 The following colloquy took place between the circuit court and Sam's attorney:

> "THE COURT: I'm curious. We've spent an hour and a half talking about this incredible delay of medical treatment and how reckless Mr. Sadler is and this ridiculous— absurd delay of medical treatment, and she's 400 yards from a hospital and delays 45 minutes to drive to Cape [Girardeau]?
> MS. CAMPANELLA [(SAM'S ATTORNEY)]: I was about to address that with her.
> THE COURT: Yes. I mean, they can put this kid in a helicopter and have her to Cape or St. Louis in minutes. So like we've spent more time talking about this than the entire transaction took. And I still don't know what he was supposed to do. I mean, there's [*sic*] four pages of text messages in a two-hour period, plus a video call. I'm missing the point here. I'm just completely missing the point.
> So educate me on what this man was supposed to do during the two-hour period that was so reckless, especially in light of, her first response is, delayed treatment for another hour.

9

MS. CAMPANELLA: Well, she just testified about how she didn't get proper medical care at Union County, and so that's why she wanted to take her daughter to a different hospital."

The circuit court asked Sam to explain her expectations of Jacob in this scenario. Sam stated that she was unaware of the extent of W.P.'s injury. Sam expressed concern that W.P. fell asleep after "snapping her bone in half" and then it took Jacob three hours to suggest W.P. needed medical care. Sam clarified that she felt it was in W.P.'s best interest to take her to a more competent hospital in Cape Girardeau, Missouri. Sam admitted that she did not respond to Jacob's text messages on January 15, 2022, until 9:38 p.m. when she left the hospital, because she held W.P. in the emergency room. At approximately 11 p.m., Jacob texted Sam, and Sam responded that W.P. was asleep in Sam's bed in pain. At midnight, the police arrived at Sam's house, inquiring about W.P.'s leg and requesting to see her.

¶ 32 Sam acknowledged that the last day Jacob had parenting time with W.P. was on January 15, 2022, because she did not believe Jacob could keep W.P. still, as directed by the treatment provider. If that was the case, W.P. would need surgery. She admitted that she went to dinner with W.P. on Valentine's Day. When asked why Jacob was not afforded the same opportunity to take W.P. to dinner, Sam admitted that she was concerned for W.P.'s safety, due to Jacob's delay in care on January 15, 2022. Since W.P.'s injury, Jacob attended two doctor's appointments, even though he was informed of all four appointments.

¶ 33 Sam testified that she opposed Jacob's proposed parenting schedule, because, with reference to the January 15, 2022, incident, she worried that Jacob was unable to make good decisions for W.P. in serious situations. Although Sam believed Jacob should have parenting time with W.P., she stated that "we haven't even got [*sic*] past eight hours ***—I'm just worried about her because she's not being changed. She's not being clothed properly." Sam's parenting time

10

schedule proposed Jacob exercise parenting time every other weekend from 9 a.m. to 6 p.m. on Saturday and 9 a.m. to 6 p.m. on Sunday until W.P. was 10 years old. Sam testified that she wanted W.P. to be old enough to use a phone to call her or 9-1-1 before W.P. had overnight visits with Jacob.

¶ 34    Sam also informed the circuit court that she had congenital heart disease. In the fall of 2021, around the time she stopped Jacob's visits with W.P., doctors recommended Sam undergo a seven-hour heart surgery. Sam, however, took medication to manage her heart health, so she no longer needed surgery.

¶ 35    On cross-examination, Sam admitted that she did not allow Jacob to see W.P. in the fall of 2021 because Sam wanted to decrease her stress levels as she approached a potential heart procedure. Sam also clarified that she believed it was closer to 7 p.m. when Jacob suggested to take W.P. to the hospital. Sam acknowledged that a physician never told her that Jacob was unable to care for W.P., however, she "g[a]ve Jacob multiple chances to come over. I told him he could at any time *** FaceTime or whatever and that." Sam admitted that, even though W.P. had multiple illnesses in the past and a broken leg, Jacob wanted to see W.P. The following discussion took place between the circuit court and Sam:

> "Q. In light of your heart condition, what is your plan for [W.P.] if something were to happen to you if she's not spending the night at all with her dad? If she has no relationship with her dad, what's going to happen to [W.P.]?
> A. Like if my heart failed? ***
> Q. Yes. I mean, you have a heart condition where they had you on the table to have heart surgery. So what happens to [W.P.] if something happens to you?
> A. Well, I have my family and Danielle [Sam's sister] ***. ***
>                          * * *
> Q. He's the father."

The court stated it would take a 15- to 20-minute recess before it adjourned for the day.

11

¶ 36    After the circuit court took the matter under advisement, the court asked Jacob to clarify his work schedule. Jacob stated he worked a six-day rotation at Choate in Anna, Illinois. The court then proceeded to state the following:

> "The most difficult part in hearing these family cases is judging credibility of the parties, especially in light of the fact that in the grand scheme of things both parties may be nice and decent people, and then trying to differentiate between who is right on disputed issues, but also who deserves the benefit of the doubt.
>
> In this case, I am disturbed most significantly by the fact that there was an agreement on October 18, 2021, in my courtroom where both parties looked at me and said, This is my agreement.
>
> Things happen, and I understand that, but when I read a pleading yesterday that says the parties can now avoid that agreement because there was not a signed order, that simply means, in my opinion, people are willing to look at me, tell me, This is what I'm going to do, and then not do it.
>
> So when you lie to the Court and don't follow through with what you represent to the Court, it takes away from your credibility. And so it really discredits you when you agree to do something in front of me and then don't follow through."

The court addressed an additional credibility issue when, on February 7, 2022, Sam told the court that a physician informed her it was unsafe for Jacob to have parenting time with W.P. but failed to provide supporting documentation. The court stated: "So I'm assuming that no doctor actually said, Mr. Sadler can't see this child."

¶ 37    Moreover, the circuit court stated that it took issue with Sam "demonizing" Jacob. The court stated on the record: "I am a father, and I simply don't know what someone is supposed to do, other than notify the mother immediately that the child has had an injury and within a couple of hours have the child back to the mother." The court did not take issue with Sam driving W.P. to Cape Girardeau, Missouri, for medical care, but the court found it inappropriate to demonize Jacob for a delay in medical treatment earlier in the day when Sam "dr[o]ve past a hospital less than 400 yards from her house" later in the day. The court continued to state:

12

"Ms. Pulliam [Sam] has a problem exaggerating what's going on. In the text messages and in court referencing that [W.P.] snapped her leg in two, that picture does not show a child's leg snapped in two. You can barely see on the picture that it is swollen. There was a reference that [W.P.] had to have surgery, but there was no surgery. The reference that the doctor said that Mr. Sadler can't see the child, but there is no record that the doctor ever said that.

From my count, Mr. Sadler has been deprived of visitation because of COVID, RSV, hand-foot-mouth disease, a broken leg, and a life-threatening heart condition, which, thankfully, is now better. It just seems every month there's a new reason for Mr. Sadler not to see his daughter.

I also have concerns in the grand scheme of things and understanding the law that the father is going to have no relationship; and a mother with a heart condition, what happens if the father has no normal relationship with the child?

Again, Mr. Sadler *** [was] demonized because, in Ms. Pulliam's eyes, Mr. Sadler did not want to have a relationship with the child until his new girl friend suggested that's true. If that is true, my view of that is, a woman suggesting to her boyfriend that he step up and be a man and support his family and be a father is not a bad thing. I would commend her if she said that. And, frankly, if he's smart enough to understand she's right, good for him. It's not a negative thing in my eyes that—

I have cases where a father has spent years avoiding the responsibilities to their children for one reason or another. [Jacob] filed this petition within six months [of W.P.'s birth] ***.

Mr. Sadler works at Choate. That creates complicated issues with regards to his schedule. When you live in Union County, you understand that. It also creates complications with regards to child support. I was a practicing personal injury and workers' compensation lawyer less than a year ago. I have cross-examined the HR director at Choate regarding these schedules. They can't figure it out. My view of that is, if there are things that need to be offset at the end of the year because he has additional overtime, then that's something the parties will have to work out between them because it's a week-to-week, day-to-day thing, and frankly, the people at Choate don't even agree on it."

The court stated that "based upon all that I've heard, I do believe it is in the best interest of the child to have a meaningful relationship with both parents." The court ordered the parties to co-parent and work together to raise W.P. The court awarded Jacob parenting time on March 12, 2022, for four hours, on March 13, 2022, for eight hours, and on March 14, 2022, for four hours. The court granted Jacob's petition and ordered the parties to start the "two-two-three" rotating

13

parenting schedule in Jacob's proposed parenting plan on March 15, 2022. The court suggested the parties download a parenting app to help with co-parenting and decision-making issues. Lastly, the parties' attorneys agreed to average Jacob's 2020 and 2021 income to determine Jacob's outstanding child support obligation.

¶ 38    Following the hearing on March 11, 2022, the circuit court entered Jacob's proposed judgment of allocation of parental responsibilities. The court ordered joint decision-making responsibilities and equal parenting time of W.P. Specifically, the court allocated equal decision-making responsibilities for the minor child's education, healthcare, religion, and extracurricular decisions. Next, the court designated Sam as the child's custodian but awarded the parties equal parenting time. The court ordered the parties to follow a two-two-three rotating schedule. Specifically, during the first week of the month, the court awarded Jacob parenting time from 6 p.m. on Sunday to 6 p.m. on Tuesday, with Sam exercising parenting time from Tuesday at 6 p.m. to Thursday at 6 p.m., and Jacob exercising parenting time from Thursday at 6 p.m. until Sunday at 6 p.m. The following week, the court awarded Sam parenting time with W.P. from 6 p.m. on Sunday to 6 p.m. on Tuesday, with Jacob exercising parenting time from Tuesday at 6 p.m. to Thursday at 6 p.m., and Sam exercising parenting time from Thursday at 6 p.m. until Sunday at 6 p.m. The parties would then return to the first week schedule and rotate week to week thereafter. In addition, the court provided a detailed holiday schedule for even and odd numbered years, including Christmas vacation and summer break. The parenting plan provided that the regular visitation schedule would continue through the summer, with the exception that each parent would receive two one-week, nonconsecutive periods of parenting time in the summer. The parties were ordered to meet in Anna, Illinois, for all exchanges.

¶ 39    On April 6, 2022, Sam filed a timely notice of appeal.

¶ 40                                    II. Analysis

¶ 41    The first issue on appeal is whether the circuit court erred by allocating parental responsibilities, specifically, parenting time and decision-making, where the court did not include an analysis of the factors in sections 602.5(c) and 602.7(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.5(c), 602.7(b) (West 2020)) when allocating parenting time and decision-making responsibilities between the parties. Sam points to the fact that the court did not mention any factor of sections 602.5(c) and 602.7(b) in reaching its decision, as evidence of such failure. We agree with Sam.

¶ 42    Determining parenting time and allocating decision-making authority are matters within the sound discretion of the circuit court. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. Sections 602.5 and 602.7 of the Act (750 ILCS 5/602.5, 602.7 (West 2020)) govern those determinations and provide that circuit courts must allocate these parental responsibilities according to the child's best interest. " 'In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child.' " *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64 (quoting *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25). We will not overturn the court's decision unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence. *Id.*

¶ 43    In the instant case, when allocating parental responsibilities (both parenting time and decision-making), the circuit court did not expressly name the Act, nor did it explicitly discuss any

15

of the best interest factors laid out in sections 602.5(c)[3] and 602.7(b).[4] Jacob argues, citing *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 18, that Sam's mere assertion that the court did not consider the statutory factors is insufficient to overcome the presumption that the court knew and followed the law. Jacob argues, similar to this case, that the *Whitehead* court did not mention any factor or summarize the evidence but expressly stated that it considered " 'all evidence' " in rendering its decision. *Id.* Jacob asserts that, here, the court considered all of the evidence in rendering its decision with regard to W.P.'s best interests, where the court stated that "based upon all that I've heard, I do believe it is in the best interest of the child to have a meaningful

---

[3]To determine the child's best interests for purposes of allocating significant decision-making responsibilities, the court should consider all relevant factors, including: (1) the wishes of the child; (2) the child's adjustment to his or her home, school, and community; (3) the mental and physical health of all individuals involved; (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making; (5) the level of each parent's participating in past decision-making about the child; (6) any prior agreement or course of conduct between the parents regarding decision-making with respect to the child; (7) the parents' wishes; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and child's daily schedules, and the ability of the parents to cooperate in the agreement; (10) whether a restriction on decision-making is appropriate under section 603.10 (where parent engaged in conduct that seriously endangered child's health or significantly impaired child's development); (11) the willingness and ability of each parent to facilitate and encourage a relationship with the other parent; (12) the physical violence or threat of physical violence; (13) the occurrence of abuse against the child or other member of the household; (14) whether one parent is a sex offender; and (15) any other factor that the court expressly finds to be relevant. 750 ILCS 5/602.5(c) (West 2020).

[4]In allocating parenting time, the court shall consider all relevant factors, including: (1) each parent's wishes; (2) the child's wishes; (3) the amount of time that each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities; (4) any prior agreement or course of conduct between the parents relating to caretaking functions; (5) the interaction and interrelationship of the child with his parents and siblings and with any other person who may significantly affect his best interests; (6) the child's adjustment to his home, school, and community; (7) the mental and physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences; (10) whether a restriction on parenting time is appropriate; (11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household; (12) each parent's willingness and ability to place the child's needs ahead of his or her own; (13) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other member of the child's household; (15) whether one parent is a sex offender or resides with a sex offender; (16) the terms of the parent's military family-care plan if a parent is a member of the United State Armed Forces who is being deployed; and (17) any other factor that the court expressly finds to be relevant. 750 ILCS 5/602.7(b) (West 2020).

relationship with both parents." Jacob argues that this statement "undoubtedly refer[s] to the best interest factors [the court] is directed to consider." We are not convinced.

¶ 44   In *Whitehead*, the circuit court stated in a letter to the parties' attorneys that it considered all of the evidence in rendering its decision, which included the guardian *ad litem*'s (GAL) report. *Id*. The appellate court determined that this demonstrated the circuit court's knowledge of the factors to be considered pursuant to section 602.7(b). *Id.* Accordingly, even though the circuit court neither explicitly mentioned the factors nor included a summary of the evidence, it was presumed that the circuit court properly considered all statutory factors, where the GAL's report analyzed the factors in depth. *Id.* Although we recognize that the circuit court is not required to make explicit findings or reference each factor in determining the child's best interest (*Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47), and this court presumes that a circuit court knew and followed the law (*G.L.*, 2017 IL App (1st) 163171, ¶ 43), here, the circuit court did not mention the statutory factors *and* did not provide a summary of the evidence as it related to the relevant factors in sections 602.5(c) and 602.7(b). Moreover, unlike *Whitehead*, there are no findings by a GAL that this court could reference to determine what factors the court specifically relied on. Rather, here, the court merely stated, "based upon all that I've heard, I do believe it is in the best interest of the child to have a meaningful relationship with both parents."

¶ 45   Furthermore, from the outset of the March 11, 2022, hearing, the circuit court, in referencing Jacob's petition for rule to show cause and Sam's motions to dismiss, stated that it "prefer[red] to move on to the merits before we deal with the other issues." As such, the court heard testimony and argument on Jacob's petition to establish parentage and parental responsibility. Despite this, the court seemed to focus on the issues set forth in Jacob's petition for rule to show cause and Sam's motions to dismiss. In particular, following the close of testimony

17

and after a short recess, the court stated that it was "disturbed most significantly by the fact that there was an agreement on October 18, 2021, in my courtroom where both parties looked at me and said, This is my agreement." Next, the court referenced additional credibility issues concerning the February 7, 2022, hearing when Sam apparently informed the court that Jacob was unable, per a physician's order, to care for W.P.'s broken leg. The court stated: "So I'm assuming that no doctor actually said, Mr. Sadler can't see this child." Lastly, the court discussed its belief that Sam was "demonizing" Jacob for W.P.'s broken leg, by continuing to discuss Jacob's lack of response on January 15, 2022, which led Sam to withhold parenting time from Jacob, resulting in Jacob's subsequent petition for rule to show cause.

¶ 46    The circuit court's criticisms, alone, do not establish which statutory factors the court analyzed in reaching its decision. We cannot presume that the court properly considered all statutory factors, where it is unclear from the record what statutory factors, if any, the court analyzed in determining that it was in W.P.'s best interest to award the parties joint decision-making and equal parenting time. Accordingly, we conclude the court's decision was against the manifest weight of the evidence. Based on the above, we reverse the court's order allocating parental responsibilities and remand this matter with directions for the court to consider all evidence and statutory factors in determining parenting time and decision-making of W.P.

¶ 47                                III. Conclusion

¶ 48    For the foregoing reasons, we conclude that the circuit court erred in its allocation of parental responsibilities, specifically parenting time and decision-making, where the court failed to analyze the relevant statutory factors in determining the minor child's best interests. For the reasons stated herein, we reverse and remand.

¶ 49    Reversed; cause remanded with directions.

18

**No. 5-22-0213**

| | |
|---|---|
| **Cite as:** | *Sadler, Jacob v. Pulliam, Samantha*, 2022 IL App (5th) 220213 |
| **Decision Under Review:** | Appeal from the Circuit Court of Union County, No. 19-F-28; the Hon. Timothy D. Denny, Judge, presiding. |
| **Attorney for Appellant:** | Winter Daye Campanella, of Carterville, IL, for appellant. |
| **Attorney for Appellee:** | Matthew Brian Ferrell of Cape Girardeau, MO, for appellee. |