NOTICE

Decision filed 01/22/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250690-U

NO. 5-25-0690

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| STARKESHIA L. WATERMAN, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 22-DN-284 |
| | ) | |
| JAMES R. WATERMAN, | ) | Honorable |
| | ) | Anna M. Benjamin, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices McHaney and Bollinger concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The circuit court's decision allocating all significant decision-making responsibility over the parties' minor child to respondent father was not against the manifest weight of the evidence. The record shows that the court balanced all relevant statutory factors and rendered a decision in accordance with the best interests of the child. The judgment of the circuit court is affirmed.

¶ 2  Petitioner, Starkeshia L. Waterman, appeals from the order of the Champaign County circuit court allocating all significant decision-making responsibility over the parties' minor child to respondent, James R. Waterman. On appeal, she challenges the circuit court's consideration of the evidence presented at the allocation hearing. For the reasons we explain below, we affirm the judgment of the circuit court.

1

¶ 3                                    I. BACKGROUND

¶ 4                         A. Temporary Order and Further Proceedings

¶ 5     The parties in this case are the biological parents of E.W., a minor born in 2022. Petitioner filed a petition for dissolution of marriage on January 30, 2023. On December 12, 2023, the circuit court held a hearing on the temporary allocation of parental responsibilities. Petitioner appeared *pro se*, and respondent appeared with counsel. After hearing testimony from both parties and from respondent's mother, the court ruled that it was in the minor's best interest that the parties share equal parenting responsibilities, alternating on a weekly basis. The court also ordered respondent to make monthly child support payments to petitioner in the amount of $283.27 and appointed a guardian *ad litem* (GAL) for the limited purpose of investigating the allocation of parental responsibilities on a permanent basis. A temporary parenting order was entered to this effect on December 15, 2023.

¶ 6     A parenting plan, created by the circuit court, was also filed on December 15, 2023. The parents were each granted significant decision-making with regard to the child's education, health, religion, and extracurricular activities, and both parents were tasked with the responsibility of making day-to-day decisions in parenting the child. The order also included a parenting time schedule, reflecting a 50/50 split in parenting time, alternating weekly on Sundays at 2:00 p.m.

¶ 7     On January 5, 2024, petitioner filed a petition to relocate with the minor and to modify the parenting plan. In it, she stated that she planned to relocate to Wisconsin at the beginning of May 2024 in order to be closer to family. She did not have employment there. She asked the circuit court to modify the parenting plan to include her new address, change the child's pickup location, and make unspecified changes to the biweekly parenting time allocation schedule. The circuit court

2

held a hearing on her petition on April 23, 2024. The court denied petitioner's requests for the reasons it provided in open court, which are not included in the record on appeal.

¶ 8 On June 4, 2024, respondent, through counsel, filed a "Petition for Parenting Time Abuse," alleging that petitioner had violated the court's December 15, 2023, temporary parenting order by denying him parenting time since approximately June 2, 2024. He further requested that petitioner be held in indirect civil contempt for violating the temporary parenting order. The circuit court held a hearing on the petition on June 27 and 28, 2024, after which it granted respondent's petition, finding that petitioner had denied respondent parenting time from June 2 through 9 and 16 through 23, 2024. The court awarded respondent make-up parenting time starting on June 28, 2024, and awarded him attorney fees.

¶ 9 On October 1 and 2, 2024, petitioner filed several motions, raising various accusations against respondent. These motions were titled as follows: "Motion to Examine/Investigate Child Pornography, Extortion, Pedophilia;" "Motion to Approve Legal Separation Agreement" (no agreement was attached); "Motion to Examine Physical/Mental/Sexual Abuse;" "Motion to Investigate 2023/2024 Tax Return;" "Motion to Investigate Loss of Possession;" "Motion to Examine Sexual Harassment;" "Motion to Examine Drug/Alcohol/Criminal History;" "Motion to Review Injuries/Hospitalization and Pharmaceutical Records;" "Motion to Examine Racism/Racial Prejudice;" "Motion to Examine Video Evidence;" and "Motion to Report Unclaimed Property/Residential Address/Disclosure of Child's Whereabouts." The circuit court described these motions as mostly containing "difficult to follow, stream-of-consciousness-type allegations."

¶ 10 On October 23, 2024, petitioner filed a petition for rule to show cause, alleging that respondent was delinquent on a portion of his child support payments. The circuit court held a

3

hearing on January 21, 2025, at which petitioner testified that she had not set up an account with the State Disbursement Unit, as required to receive the payments. She stated that she had received paper checks in the past, and believed that those would continue. The circuit court denied her petition.

¶ 11                              B. Permanent Allocation Hearing and Evidence

¶ 12    The circuit court held a hearing on permanent allocation of parental responsibilities on June 16, 17, and 18, 2025. Petitioner testified that she was born in Wisconsin, still had family there, and currently lived in Decatur, Illinois. She worked as a food delivery driver and was about to start a retail position; she was also certified to drive for Uber. She stated that she and respondent separated when she was about four months pregnant with E.W., and that respondent did not assist her with caretaking for the child. She denied ever depriving respondent of parenting time, except for overnights, because of his alleged history of pedophilia—which she described, without providing any foundation. She also testified that respondent whipped her with a cell phone charger approximately two weeks before she filed the dissolution case, and she provided a photo of the alleged injury that resulted. The circuit court noted that the contents of the photo were difficult to make out.

¶ 13    Petitioner also testified about the domestic abuse she experienced from respondent prior to the birth of their daughter, including an incident in June 2020 while they were living in California, that resulted in respondent being subject to a 45-day protective order. She also claimed that respondent punched her in the abdomen while she was pregnant. She provided documentation showing that she sought medical treatment; however, the court noted that the exhibit indicated that petitioner claimed the punch was accidental, and that she reported to her medical provider that she

4

smoked marijuana while pregnant. Petitioner also stated that she believed respondent was twice convicted of driving while under the influence, as well as driving on a suspended license.

¶ 14    Petitioner alleged that respondent was fired for sexual harassment and made further allegations about his behavior toward women. She stated that she called child protective services after discovering a bruise on the minor that respondent had not mentioned to her. They asked if she believed respondent would do anything sexual, to which she responded yes, because he had done sexually inappropriate things to her. Petitioner further testified to other alleged instances of respondent's failure to properly care for their daughter, including allowing her to get a sunburn, not buying her a present for her first birthday, and allowing her to develop a scratch on her hand and face. Petitioner added that respondent did not fully explain the source of the scratches. She also claimed that respondent was using his current girlfriend for transportation and money, and that the relationship was not a serious one.

¶ 15    Petitioner showed various photos of herself and her daughter at family events, activities, and holidays; the photos also included her family members and boyfriend. While she claimed that respondent had not given the child a first birthday gift, petitioner stated that she spent about $1,500 on a present for her.

¶ 16    On cross-examination, petitioner acknowledged that she had had several jobs over the past few years. She also denied being convicted of domestic violence against her mother, and she showed a court records search from Wisconsin showing no results for her name. She did, however, admit to requiring a psychiatric hospitalization in 2016 or 2017, which she said was considered domestic violence against herself. Petitioner further stated that she underwent a psychological evaluation in April 2025 and said it showed that she did not have any mental health problems other than stress related to the case. She testified that she underwent the evaluation because the GAL's

5

report suggested that she might be bipolar or some other condition; however, petitioner described her mental health as "great." Petitioner submitted documentation of an April 3, 2025, hospital visit at which she received the evaluation; it indicated that she had a counselor and a safety plan.

¶ 17    One of petitioner's previous employers, Michelle Kohler, also testified. Petitioner began working under her in early 2022 as a caretaker for Kohler's uncle. Kohler testified that respondent would sometimes help petitioner with her work, but Kohler eventually had to kick him out because he would be drunk and belligerent, and would store alcohol in the refrigerator.

¶ 18    Respondent testified that he lived in Indiana with his girlfriend, where he was employed as a diesel mechanic. He also had siblings, parents, and a grandmother who lived nearby and all spent time with the child. His grandmother also babysat her while respondent and his girlfriend were at work. In 2022, respondent was honorably discharged from the Marine Corps after four years of service; however, he acknowledged that he lost his rank as corporal because he was "stupid." He testified that after his daughter was born, petitioner cared for her while he worked.

¶ 19    Respondent admitted that there were instances of domestic violence between the parties, including petitioner cutting his neck while pregnant with their daughter. He also admitted to receiving a DUI conviction in July 2022 for which his license was suspended for six months and he was ordered to perform community service and pay a fine. He received a second DUI conviction in February 2023 after which his license was suspended for an additional six months, he was ordered to pay additional fines, and was ordered to engage with Alcoholics Anonymous. He also received a ticket for driving on a suspended license on a separate occasion. However, he testified that he had held a valid driver's license since February 2024 and did not consume alcohol during his parenting time with his daughter.

¶ 20    Respondent further testified that he moved out from the home he shared with petitioner and into his mother's house in January 2023. At that time, his license was still suspended, making visits with his daughter difficult. He added that petitioner tried to prevent him from seeing her, and between June and December 2023 he only saw the child a handful of times, always with petitioner present. Respondent also provided the court with photos of his home, including the child's room, as well as photos of himself and his family engaging in various activities with E.W. Regarding the scratches petitioner referenced in her testimony, he testified that on one occasion, his mother was watching the child when she phoned both parties to let them know that she stuck her hand under a dog gate and scratched her hand. The second time, the child was with his grandmother; he understood that she tripped and police and DCFS were called, but everything was cleared.

¶ 21    Respondent's mother, Gwendolyn Johnson, testified that she saw E.W. every other week, during respondent's parenting time, and often spent time with her at Johnson's mother's house after work. She testified that her mother—respondent's grandmother—was 70 years old, but she was very healthy and had the stamina to care for a toddler. Johnson stated that the child appeared to be very happy with her great-grandmother and had a structured environment under her care.

¶ 22    Through her observations of respondent's time with his daughter, including at various family events and outings, Johnson believed that the child was the center of his universe. Johnson said that the child runs to him and seeks him out, and she described her son as a loving father whose care for E.W. knew no limits. Johnson acknowledged respondent's alcohol consumption and the concerns she had for him approximately two and a half years ago. She feared that he would drink himself to death. When he moved in with her in 2023 after separating from petitioner, the first month was difficult. However, Johnson testified that he did not consume alcohol in her home,

7

they had conversations about him needing to get his drinking under control, and Johnson currently had no concerns about his drinking.

¶ 23    Johnson acknowledged that E.W. got a scratch on her hand while at Johnson's home, which she said was caused by the child sticking her hand under a dog gate. Johnson stated that she put some cream on it and called respondent, who instructed her to inform petitioner, which Johnson did. She also explained that the scratch to the child's face occurred at Johnson's mother's home while Johnson was present. She said the child slipped while playing and bumped her head on the entertainment center. Johnson added that there was absolutely no need for medical care for the injury.

¶ 24    Johnson did express concern that the child was non-verbal, and worried that she was delayed because of a possible hearing issue. Johnson testified that most of the time, she has no difficulty understanding what the child wants, and the child also knows some sign language. When Johnson stated that she sometimes helped respondent in bathing the child, petitioner responded that she was uncomfortable with any man giving her daughter a bath.

¶ 25    Respondent's girlfriend, Takeyla Hall, testified that she had lived with respondent for the past two years, and she worked as a nursing assistant. She regularly picked E.W. up from respondent's grandmother's house after work, and she had observed respondent's interactions with his daughter. Hall believed that respondent and the child had a strong bond; he interacts and plays with her, and the child goes to him over anyone else in the home. Hall also testified that she believed the child had good relationships with respondent's parents and grandmother. She said he does not drink alcohol during the weeks that he has parenting time, and Hall did not have any concerns about his alcohol consumption in general. Hall did have concerns about E.W. possibly

8

being delayed; Hall noted that she does not interact with other children and does not know how to count.

¶ 26    Maria McAllister testified, stating that she was petitioner's mother. She stated that petitioner did not move back to Wisconsin; instead, she only stayed with McAllister for a few days. McAllister felt that petitioner was safe around the child and that she was a good mom. She was not aware of any safety concerns for the child under petitioner's care. McAllister further testified that the last time she saw respondent a few years ago, he was very intoxicated.

¶ 27    Petitioner testified in rebuttal to state that respondent and his family were racist, that respondent questioned whether she and their daughter were Black, and that respondent compared their daughter's hair to his pubic hair. She also introduced an exchange of messages between the parties, in which petitioner made several accusations about respondent's family, and respondent answered that he was going to get a paternity test to see if E.W. was his, and even if she was not, he would fight to keep her with him. Petitioner also claimed that she had a stipulation that respondent was not to be around their daughter naked.

¶ 28    Petitioner further presented a photo of the child on the toilet, and said she was potty-training her. Petitioner then stated that the child would dig in her diaper when "uncomfortable with the poop," and that she would do what petitioner referred to as "poops and crafts, poop Picasso." Petitioner explained that this meant the child was "eager about learning about" her body and was ready for potty-training.

¶ 29    The GAL submitted a report with her recommendation to the court, which was based on her interviews with the parties and several other witnesses, as well as her review of the documents submitted by the parties. The GAL wrote that respondent told her he had concerns about petitioner's mental health. He said that there is no discipline or schedule for the child when she is

9

at petitioner's house, and whenever petitioner picked her up for parenting time, she would take her to the emergency room if she saw a bruise on her body. She had also called DCFS on respondent twice, to report a bruise on her thigh. DCFS's investigations concluded that the reports were unfounded. Respondent further told the GAL that petitioner had twice taken the child to the emergency room for a rape kit. Respondent also expressed concern that petitioner would move out of the area, as she had told him on several occasions that she would do so.

¶ 30    In her interview with petitioner, petitioner accused respondent of, *inter alia*, texting underage girls, raping her, abusing her during their marriage, hitting her in the stomach while she was pregnant, and having a drinking problem. Petitioner also told the GAL that respondent had no interest in the child until the parties separated, and that he had not asked to see the child until after the temporary allocation hearing. She further stated that respondent did not ask for parenting time and that she was the child's primary caretaker.

¶ 31    The GAL expressed her own concerns with petitioner's mental health. She noted the serious accusations petitioner made against respondent regarding his interactions with underage girls and his alleged abuse of E.W., none of which petitioner backed with any evidence. The GAL opined that petitioner had "gone to extreme lengths to obtain an Order of Protection against [respondent] and get him into legal trouble" and that she had "gone to extreme lengths to attempt to interfere with [respondent's] parenting time." Their relationship had been highly contentious, and petitioner did not allow respondent parenting time until the court ordered her to do so. The GAL believed that petitioner was not able to facilitate and encourage a close relationship between the child and respondent.

¶ 32    In reviewing the statutory factors relevant to determining the child's best interest in the allocation of parental responsibilities, the GAL opined that the factors favoring petitioner were:

10

the parent's past participation in significant decision-making regarding the child; and the parent's prior course of conduct regarding decision-making. See 750 ILCS 5/602.5(c) (West 2024) However, she noted that the circuit court granted the parties equal parenting time, and that petitioner had only made more decisions for the child because the parties split when she was five months old, and because petitioner withheld parenting time from respondent for some time. The GAL wrote that she believed the factors favoring respondent were: the mental and physical health of all individuals involved, given petitioner's likely mental health issues; the ability of the parents to cooperate to make decisions, due to petitioner's behavior and accusations; and the willingness of the parents to facilitate and encourage a relationship between the child and the other parent, for the same reasons.

¶ 33    The GAL concluded her report with the recommendation that respondent be allocated sole decision-making responsibilities for the child's religion, extracurricular activities, education, and medical care. She further recommended that the parties continue to share equal parenting time. In making this recommendation, the GAL did not discount respondent's history of issues with alcohol, including his two DUIs. However, she also noted that there were no reports of his abusing alcohol in the year and a half prior to her investigation.

¶ 34                                  C. Circuit Court's Order

¶ 35    After the hearing concluded, the circuit court took the matter under advisement. It entered a memorandum order and opinion on August 11, 2025. After summarizing the abovementioned testimony and evidence, the circuit court reviewed the relevant best-interest factors pursuant to section 602.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.5(c) (West 2024)). As the child was two years old, she was unable to express her preferences as to the division of parenting time and responsibilities. The evidence showed that the child was

11

adjusted to the home and community of both parents, and the circuit court found this factor to be neutral.

¶ 36    Regarding her relationships with any other people, the court noted that she appeared to have close, loving, and ongoing relationships with both parties, and with respondent's family. Respondent had a lot of family support nearby, and the testimony established that they help him take care of the child while he is at work. While petitioner's mother also testified, the circuit court wrote that she lives out of state in Wisconsin, and she did not provide significant details about her relationship with E.W. Petitioner also mentioned that she had been dating someone, but he did not testify, and there was insufficient evidence of his having any relationship with the child.

¶ 37    Next, the circuit court addressed the mental and physical health of all individuals involved. It wrote that the child was not speaking, and the parties appeared to agree that she needed speech therapy and possibly additional evaluations. The court also noted respondent's history of alcohol abuse, including the two DUIs. However, he sought treatment through AA and abstained from drinking during his parenting time. The court added that his family supported him through his recovery, and both his mother and girlfriend testified that they no longer had concerns about his alcohol use. Furthermore, respondent had been employed at the same job since 2023.

¶ 38    The circuit court then discussed petitioner's mental health, including her April 2025 psychological evaluation and safety plan. She was given information about outpatient therapy, but did not testify as to whether she had followed through with any of the referrals. She also reported to her medical provider that she has a history of tobacco use prior to pregnancy "but continues to smoke marijuana." The circuit court further noted that respondent's counsel had argued that petitioner was unemployed and lacked stable housing. He also expressed concerns about her history of suicidal ideation and her seeming inability to engage in a logical thought process.

12

Regarding the latter, the circuit court stated that this was borne out in the chaotic, random way she numbered and organized her exhibits. The circuit court concluded that this factor weighed in favor of allocating significant decision-making authority to respondent.

¶ 39    Regarding the parents' ability to cooperate in making childcare decisions, the circuit court began by stating that this factor was critical when considering joint decision-making, as conflict between the parents ultimately harms the child. Here, the circuit court stated that the GAL described the high degree of conflict in the parties' relationship, and there were numerous examples presented to the court of their inability to communicate in a respectful manner by text. The court continued that petitioner "has been adamant that [respondent] is not safe, despite a lack of any evidence to that effect for the last two years," making "scandalous" yet unproven allegations about him at every opportunity. Thus, the circuit court found that the parties could not make significant decisions for their child jointly, and this factor also weighed in respondent's favor.

¶ 40    The circuit court next found that the level of each parent's participation in past decision-making weighed in favor of petitioner, as she testified that she had always taken the child to medical appointments. Respondent acknowledged that this was true, although he did accompany petitioner in taking her on a couple of occasions. Similarly, the circuit court found that the amount of time each parent spent caretaking over the past year weighed in petitioner's favor as well.

¶ 41    The circuit court also found that the factor of any prior conduct between the parents relating to decision-making or caretaking weighed slightly in petitioner's favor, as petitioner had made most of the parenting decisions and had the vast majority of parenting time up until the temporary allocation hearing. Even when the parties lived together, the testimony indicated that petitioner was the primary caretaker for the child, while respondent worked. The court added that respondent had a drinking problem at that time, which likely had a negative impact on his reliability as a

13

parent. After the parties' separation, petitioner refused to allow respondent overnight parenting time and otherwise restricted his ability to see the child. The circuit court found respondent's testimony to be more credible than petitioner's when he stated that petitioner prevented him from being able to care for the child after the separation. However, the parties had shared parenting time on an equal basis since the temporary allocation order, and each made decisions for the child in their time with her. The circuit court concluded that this factor slightly favored allocating the majority of decision-making responsibilities to petitioner.

¶ 42 Regarding the wishes of the parents, the circuit court wrote that respondent requested sole decision-making responsibility. In support, he argued that he had a greater support system and that he tried to teach the child new things. However, he agreed that it was important for her to have regular contact with her mother. Petitioner requested that respondent only be given supervised parenting time, due to the various allegations she made against him. As the court found that these allegations were not based on any credible evidence, it determined that this factor weighed in favor of respondent.

¶ 43 The circuit court found in favor of respondent on the factor of the child's needs. There was evidence that the child was delayed and possibly had special needs, and the court was concerned whether petitioner had the insight and judgment necessary to address these issues. The court added that petitioner appeared more focused on attacking respondent than getting the child assessed for speech and other potential issues. The circuit court also found in respondent's favor regarding the logistics of transporting the child between the parents. There were no prior issues with transporting her to drop-offs, except for a period when petitioner did not have transportation. Respondent testified that he provided all of the transportation during that time.

14

¶ 44   As for the willingness and ability of each parent to facilitate the child's relationship with the other parent, the circuit court reiterated its findings and its concern regarding petitioner deliberately withholding parenting time from respondent and making baseless allegations against him, including having the child tested for rape after noticing a bruise on her leg, which the court stated was not reasonable behavior. However, the court noted that she also presented text messages between the parties that showed that the parties were both cruel to each other at times, though it described petitioner's messages in particular as "disturbing." As petitioner had failed to demonstrate a willingness or ability to encourage a close relationship between the child and her father, the circuit court found this factor to weigh "strongly in favor" of respondent.

¶ 45   Next, the circuit court found no credible evidence of physical violence directed towards the child. However, both parties testified to domestic violence between themselves, which the circuit court summarized in its order. However, when petitioner showed the court photos of her supposed injuries from respondent's abuse, the photos appeared not to show any of the alleged evidence of abuse. She did seek medical treatment for the punch to her abdomen, but she stated at the time that it was accidental. Respondent testified that petitioner cut his neck, which petitioner claimed was done in self-defense. The circuit court concluded that both parties behaved dangerously toward each other prior to their separation, and this factor favored neither party.

¶ 46   Regarding whether there was any evidence supporting placing any restrictions on either party's decision-making or parenting time, the circuit court reiterated that petitioner's accusations against respondent were completely unsupported. It further noted that she seemed to jump "to the very worst conclusions" about him when she sees even a minor injury on the child. She also reported him to DCFS and the authorities several times, each of which turned out to be unfounded.

The circuit court therefore found no reason to impose any restrictions on respondent's parenting time or decision-making.

¶ 47    Thus, the circuit court ruled that it was in the overall best interests of the child that respondent be designated the custodial parent and allocated all significant decision-making responsibilities, as joint decision-making did not seem realistic, and respondent had proven to be the parent more likely to continue to facilitate and encourage a close relationship between the child and petitioner. The court added that his employment and family situation were stable, and he appeared to have sincerely addressed his prior alcohol abuse. Petitioner, meanwhile, lacked proper judgment in making decisions for the child, and put her contempt for respondent above the needs of her daughter. Lastly, the circuit court ordered the parties to continue exercising joint parenting time on a week-to-week basis, subject to change as necessary when the child began school.

¶ 48    Petitioner filed a timely notice of appeal, which was expedited pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018).

¶ 49                                    II. ANALYSIS

¶ 50    On appeal, petitioner argues that the circuit court erred by awarding respondent medical decision-making authority, because she, and not respondent, has knowledge of the child's medical history and has taken her to all of her previous medical appointments. Petitioner further argues that the trial court should not have denied her full custody of the child, because petitioner has never harmed her daughter and always did her best to parent her. Petitioner also states that the circuit court ignored threats to the child's safety by awarding respondent custody and primary decision-making authority, alleging that respondent has an endangerment charge against him, is a recovering alcoholic, and has solicited minors. She also contends that the court determined that

16

she had a mental illness, when both petitioner and her doctors said she did not have any problems with her mental health.

¶ 51    In support of her arguments, petitioner summarizes and restates the allegations she made before the circuit court, including: that respondent had two DUIs and a history of alcoholism; that he abused petitioner during their marriage; that he solicited minors for child pornography in exchange for photos of himself and petitioner engaged in sex, that he bathed the child despite petitioner's wishes; and that she had a 45-day-long protective order against him at one point. Petitioner does not cite to any statutory authority or caselaw supporting her arguments, aside from listing some criminal statutes relating to child pornography and sexual assault. She also does not challenge the circuit court's ruling concerning parenting time, and we therefore do not address it here.

¶ 52    Section 602.5 of the Act provides that the circuit court "shall allocate decision-making responsibilities according to the child's best interests." 750 ILCS 5/602.5(a) (West 2024). Likewise, our supreme court has long emphasized that "the best interests of the child is the 'guiding star' by which all matters affecting children must be decided." *In re Parentage of J.W.*, 2013 IL 114817, ¶ 41. The allocation of decision-making authority is within the sound discretion of the circuit court. *Sadler v. Pulliam*, 2022 IL App (5th) 220213, ¶ 42.

¶ 53    The Act further provides that when the circuit court determines the child's best interests in order to allocate parental decision-making responsibilities, the court must consider all relevant factors, including:

> "(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;
>
> (2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2024).

¶ 54 In child custody matters, "there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child." *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25. We will not overturn the circuit court's decision "unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *Sadler*, 2022 IL App (5th) 220213, ¶ 42. A decision is against the manifest weight of the evidence where the opposite

18

conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 56.

¶ 55    In the present case, the circuit court's allocation order contains a point-by-point list of its detailed findings on each relevant statutory factor. In the interest of not repeating our summary of those findings, we refer to our earlier review of the circuit court's order and opinion. Moreover, we find that the evidence in the record on appeal directly supports the circuit court's findings. As for the circuit court's determinations based on its assessment of the credibility of witness testimony and its resolution of competing testimony, we defer to the circuit court as the finder of fact.

¶ 56    Petitioner primarily contends that the circuit court overlooked or otherwise failed to properly balance three categories of evidence—her primary involvement in making medical decisions regarding the child, her alleged lack of mental health concerns, and the various allegations against respondent that would make him a threat to the child's safety. Regarding the first, the circuit court clearly acknowledged petitioner's comparatively greater involvement in past decision-making for the child, including taking her to all of her medical appointments. Indeed, this was the most significant evidence the circuit court noted as weighing in favor of awarding petitioner the majority of the decision-making responsibilities.

¶ 57    The circuit court applied its consideration of both parents' prior caretaking functions in determining that the statutory factors listed in sections 602.5(c)(5) and (6) of the Act (750 ILCS 5/602.5(c)(5), (6) (West 2024)) went in favor of petitioner. The court recognized that she was the child's primary caretaker during the parties' marriage while respondent was at work. After their separation and pursuant to the court's temporary order, the parties were supposed to split parenting time and responsibilities equally, but even then, the circuit court noted that petitioner took on a

greater share of the caretaking responsibilities because she tried to deny him his parenting time, in violation of the court's order.

¶ 58    Thus, the circuit court did consider the full extent of petitioner's involvement in making medical and other decisions for the child. However, it concluded that while this weighed in her favor, it would be in the child's best interests to award respondent primary parental responsibilities. We find that this decision was not against the manifest weight of the evidence.

¶ 59    We turn next to petitioner's argument that the circuit court determined that she was mentally ill despite evidence to the contrary. Petitioner challenges why she was "told *** [she has] a mental illness through the court and not a medical professional," when she testified that she was fine and her doctors did not say she was mentally ill. The circuit court expressed concern about petitioner's mental health, as well as her ability to display insight and judgment—particularly regarding her prioritizing attacking respondent over parenting her daughter. The court explained that these concerns arose in part from the evidence of petitioner's medical history and her psychological evaluation, including the fact that she was referred to therapy and seemingly did not follow through on the referrals. The circuit court further stated that its concern arose from its observation of petitioner during the hearing, including: the repeated unfounded allegations she made against respondent; her inability to present exhibits or testimony in a logical, coherent manner; and her use of certain exhibits, the content of which the court described as "disturbing."

¶ 60    In contrast to petitioner's testimony, the circuit court found respondent to be a credible witness, and there was no evidence of his having any current mental health concerns that would impact his parental decision-making ability. The circuit court noted his history of alcohol abuse, including the DUIs. However, the court heard testimony from him and multiple other witnesses, and read in the GAL report, that he had worked on this issue in recent years, and did not consume

20

alcohol when he was with his daughter. Ultimately, the circuit court determined that it was in the child's best interests to allocate significant decision-making responsibility to respondent on the factor of mental and physical health. See 750 ILCS 5/602.5(c)(3) (West 2024). We find no basis for disturbing its decision or finding it to be against the manifest weight of the evidence.

¶ 61 Lastly, petitioner argues that there are several reasons why it would not be in the child's best interests to allow respondent to exercise decision-making authority over her, based on petitioner's allegations regarding his inappropriate conduct. Regarding the allegations about his drinking and DUIs, we repeat our above discussion and reiterate our finding that the circuit court adequately considered how respondent's past and present alcohol use factored into the best-interest analysis. As the circuit court observed, the majority of petitioner's remaining allegations lack any evidentiary support. The court opined that petitioner continued to make illogical, baseless accusations against respondent instead of prioritizing her daughter's needs.

¶ 62 As for the allegations of abuse against her, the circuit court recognized that the parties' relationship had been full of conflict and both sides had caused each other harm. However, the court found that respondent was much more likely to facilitate a relationship between the child and petitioner than vice versa. The court determined that the parties were not able to work together to make decisions for the child, thus requiring a ruling that allocated most, if not all, decision-making authority to one parent or the other. Based on the totality of the relevant statutory factors, the circuit court concluded that it would be in the best interests of the child that this parent be respondent. For all the aforementioned reasons, we agree.

¶ 63                                    III. CONCLUSION

¶ 64    For the reasons stated, the circuit court did not err in allocating all significant decision-making responsibility over the parties' minor child to respondent father. The judgment of the circuit court is affirmed.


¶ 65    Affirmed.