NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241511-U

NO. 4-24-1511

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 28, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF GARNHART | ) | Appeal from the |
| (Justin Garnhart, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Winnebago County |
| and | ) | No. 17D41 |
| Meghan Garnhart, | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Donald P. Shriver, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Steigmann and Grischow concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed, concluding respondent had not established any error with respect to the circuit court's denial of her motion to modify an order restricting parenting time.

¶ 2   Respondent, Meghan Garnhart, appeals the circuit court's judgment denying her motion to modify an order restricting her parenting time with her two daughters. On appeal, respondent argues the court erred when it (1) failed to reference the relevant statute and the factors set forth therein in its written decision, (2) allowed a perceived lack of accountability to set the legal standard, (3) considered her daughters' wishes to have the supervised parenting time remain in effect, (4) considered her successful supervised parenting time as a basis to keep supervision in place, (5) discredited the testimony of her therapist, (6) found a "nexus" between her in-court conduct and her relationship with her daughters, and (7) found the evidence presented did not support a modification. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4        This appeal comes before this court following contentious dissolution and postdissolution proceedings. The dissolution proceedings commenced in 2017 with petitioner, Justin Garnhart, filing a petition to dissolve the parties' marriage. Over the years that followed, the parties repeatedly appeared before the circuit court and this court for a multitude of reasons. See, *e.g.*, *In re Marriage of Garnhart*, 2021 IL App (2d) 191043-U; *In re Marriage of Garnhart*, No. 4-22-1089 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)); *In re Marriage of Garnhart*, 2023 IL App (4th) 230025-U; *In re Marriage of Garnhart*, No. 4-23-0111 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)). Respondent has primarily represented herself throughout the proceedings, while petitioner has been represented by counsel. With respect to the proceedings currently before this court for review, respondent represented herself below but then retained counsel to represent her on appeal. The record on appeal is in excess of 10,000 pages. The following background is relevant to the issues presented.

¶ 5                        A. Order Restricting Parenting Time

¶ 6        In 2019, the circuit court, the Honorable Ronald A. Barch presiding, issued a decision following a three-day hearing concerning the parties' parenting time with their daughters, M.G. (born 2007) and S.G. (born 2011). See *Garnhart*, 2021 IL App (2d) 191043-U. The court ordered restrictions to respondent's parenting time pursuant to section 603.10(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/603.10(a) (West 2018)), including, in pertinent part, that her parenting time be supervised. At the time of the court's decision, respondent's parenting had already been temporarily restricted in this fashion. The court provided the following written explanation for the restrictions imposed against respondent's parenting time:

            "With the exception of physical abuse directed towards the parties'

daughters, which thankfully has not occurred, [respondent] has essentially checked off all the boxes analyzed in [*In re Marriage of Mayes*, 2018 IL App (4th) 180149].

For the past 2 ½ years [respondent] has demonstrated an absolute, unequivocal inability to control her anger and frustration towards [petitioner]. She has engaged in acts of physical abuse, emotional abuse, harassment, stalking, interference with civil liberties and willful deprivation towards [petitioner]. A Plenary Order of Protection [was] entered against her as a result of her conduct towards [petitioner]. Even before the plenary order entered [respondent] was the subject of an emergency order of protection which she violated on multiple occasions. [Citations.] A number of violations occurred during the immediate lead-up to trial and while the trial was ongoing.

Over the past 2 ½ years [respondent] has made a mockery out of court orders designed to diminish litigation turmoil. Among other things she has persistently and repeatedly violated orders in Case No. 2017[-]D[-]41 which expressly prohibited the parties from discussing litigation and from disparaging the other party to the children. When necessary, such rules of the road orders are appropriate. [Citation.] In fact, at the conclusion of evidentiary hearings covering multiple days the [court] found [respondent] in indirect civil contempt of court as a result of her repeated and persistent violations of the court's temporary orders prohibiting the parties from discussing litigation with the girls and further prohibiting [respondent] from disparaging the other party to the girls. As a result of concerns raised about the substance of [respondent's] telephonic communications with the girls, the court entered an order allowing for the monitoring and recording of her phone

conversations with the girls. Yet, even with the knowledge that she was being recorded and monitored, [respondent] was unable to control her anger and frustration and lashed out at [petitioner]. As noted above, during a call in November 2018 with the girls listening and sobbing, [respondent] can be heard stating things like: 'I'm sick of him using you guys.' 'He doesn't give a damn.' 'I'm sick of it. I'm sick of him. I'm sick of his appalling ways. I'm sick of it being unfair.' 'Don't listen to him.' 'No my kids don't want to treat me like crap like you do.' 'I deserve my phone calls with my kids, not with your goddam crazy dad in the background trying to han[g] up and you know, he's heartless. He doesn't care [M.G.] He could care less about our relationship.' 'Quit trying to make your kids choose between one or the other and just back off.' 'You're disgusting.' [Citation.]

[Respondent] has engaged in other misconduct that directly affected the girls as well. On multiple occasions she engaged in hysterical behavior before, during and after transitions, at times yelling and cursing at [petitioner] with the girls present. During one incident she entered his car and refused to get out, thereby preventing him from leav[ing] with the girls. On a different occasion she drove to his house with the girls in her car, pounded on the door and cussed at him. In one instance she appeared at his home uninvited, gained entry through the girls and made her way to his room. After propositioning [petitioner], she threatened suicide and crawled out on to the roof of his house where she remained for 10-20 minutes. The record also evidence[d] multiple instances wherein [respondent] delayed, disrupted or flatly withheld his parenting time.

While the case has been pending [respondent] separately pleaded guilty to

two misdemeanor charges in exchange for court supervision (obstructing service of [petitioner's] first emergency order of protection and violation of an unrelated no stalking, no contact order). She was prosecuted for felony assault of [petitioner's] father. While a jury found [her] not guilty of the criminal charge, this court is convinced by a preponderance of the evidence that [respondent] did shove and strike [petitioner's] step-father *** during a court-scheduled property inventory causing him injury. [Citations.]

In February 2019, [respondent] applied for and received a Family Medical Leave Act leave of absence from her job. [Respondent] reported that she needed the leave to deal with stress and depression.

The court has witnessed [respondent's] anger and frustration first-hand. At least one-half of all hearings over the past 1 to 1 ½ years included a panorama of emotion from [respondent], typically manifestations of anger, frustration and tears. It was not uncommon for [respondent's] in-court behavior to be argumentative and at times vulgar. On multiple occasions [respondent] departed the courtroom in tears or in anger and failed to return, at times stranding her attorney and during periods of self-representation leaving the court in a lurch. [Respondent] has also referred to [guardian *ad litem* (GAL)] Dittmar and Attorney Kim [(petitioner's counsel)] in disparaging fashion both in court and in written communications.

GAL Dittmar is recommending continuation of the current parental restrictions on [respondent], including supervised parenting time and monitored phone calls. GAL Dittmar is recommending that the court order [respondent] to be evaluated by a clinical psychiatrist and a psychologist for mental health problems

and that she be ordered to follow through on any treatment recommendations that spring from the evaluations. In addition, GAL Dittmar recommends that [respondent] be ordered to submit for a substance abuse evaluation and that she be ordered to comply with any treatment recommendations associated with the assessment.

To be clear, [respondent] has repeatedly professed to be embarrassed and regretful over her behavior over the past 2 ½ years. She denies she is still angry with [petitioner] and insists she is ready to move forward. [Respondent] also denies she violated any court orders and specifically denies she has engaged in any conduct which could lead to alienation between [petitioner] and the girls. As it turns out, [respondent] denies all the misconduct [petitioner] claims occurred over the past 2 ½ years other than that misconduct which is documented by her own texts or otherwise recorded pursuant to court order. Based upon the totality of documented misconduct, [respondent's] denial of undocumented conduct is wholly lacking in credibility.

In the end, [respondent] is in denial about the impact of her misconduct on [petitioner] and, more importantly, its likely effect upon the girls. She is simply unwilling to acknowledge the abuse she inflicted on [petitioner]. She refuses to acknowledge that she has repeatedly and persistently ignored court orders. And, incredibly, she is in denial about the impact of her anger and volatility on the girls. Astonishingly, [respondent] continues to blame [petitioner] for current restrictions of her parenting responsibilities. What troubles the court is that [respondent] offers apologies for her past documented misconduct, and assurances of good behavior

moving forward, but she offers no explanation as to the cause of her past misconduct or a plan to deal with the underlying cause(s) of her misconduct, be it substance abuse, anger management problems or untreated mental health concerns.

Absent assessment and treatment of the underlying causes of [respondent's] behavior, the court believes [respondent] will simply return to the bad behavior that led to the current parenting time restrictions. It should be noted that the court previously attempted a transition away from supervised parenting time based upon good behavior and assurances from [respondent] that she would not disparage [petitioner] or discuss litigation with the girls. [Respondent] unfortunately reverted back to her bad behavior within months of resuming unsupervised time. [Respondent] is not 'over' [petitioner] as she claims. Indeed, evidence of misconduct leading to trial and during trial confirms she remains extremely upset and vengeful. If the court were to simply lift the parental restrictions the court believes [respondent] is likely to restart the damaging behavior that led to the second round of restrictions in the first place. The restrictions will stay as long as the court remains fearful that [respondent's] angry and emotionally volatile behavior and conduct aimed at alienation is likely to recur." (Emphases omitted.)

The court also addressed the potential for modification of the restrictions placed on respondent's parenting time:

"As in the *Mayes* case, [respondent] can continue to contend that her behavior towards [petitioner] and the girls is not inappropriate or harmful to the girls, but she must acknowledge that the court has concluded otherwise. The court believes [respondent] is the party responsible for the behavior and reactions to the

- 7 -

frustration, anger and other emotions that have arisen too often over the past 2 ½ years. So too, it is [respondent] that is in control of the changes she needs to make and demonstrate to the court before the restrictions will be lifted or modified. [Respondent] would be well-served by undergoing an assessment for substance abuse, anger issues and mental health concerns. The court will consider a motion to modify once [respondent] is able to establish that she has been evaluated in all three areas and has completed recommended treatment and counseling. Ultimately, modification of the parental restrictions will remain available as governed by [section 603.10(b) of the Act (750 ILCS 5/603.10(b) (West 2018))]."

¶ 7                    B. Denial of Motion to Modify Parenting Time Restrictions

¶ 8            In 2020, the circuit court, the Honorable Joseph J. Bruce presiding, issued a decision denying a motion to modify parenting time restrictions filed by respondent. The court provided the following oral explanation for its decision:

"Now, the issue that I have is, *** and I'm a little bit familiar with cognitive behavioral therapy but it does attempt to teach skills to, you know, as far—practical skills, coping mechanisms. But my concern is that if there's no accountability or, or hardly any accountability, and if the focus is on, I'm going through all of this counseling, what is he doing? What is he doing? Is he seeking treatment? That makes me very skeptical as to whether [respondent]she may have been, you know, taught the skills but can she implement those skills?"

The court further stated:

"[Y]ou have to come back in here and convince me that you understand your responsibility, do not shift blame to [petitioner] and convince me that you're

capable of *** seeing these children in an unsupervised setting where they're not going to be put in the middle between you and [petitioner] and you're not going to play emotional games with them or you're not going to just fall apart just and *** be an emotional wreck around them. Because if that's the case, *** they're going to have emotional harm and [be] damaged by unsupervised visitation."

The court additionally noted:

"And the fact of the matter is, [respondent], with all due respect, things are going to make you upset and you have to demonstrate your ability to control yourself when you're upset. This is part of the whole issue that Judge Barch made the decision on which you—

***

—do not have that ability to control yourself. And you're exhibiting it now."

¶ 9        C. 2024 Motion to Modify Parenting Time Restrictions

¶ 10        In January 2024, respondent, after several unsuccessful attempts to modify the parenting time restrictions imposed against her, filed another *pro se* motion to modify parenting time restrictions, which is the subject of this appeal. In the motion, respondent sought, amongst other things, to remove the requirement that her parenting time be supervised. She argued there had "been changes in circumstances" and she was "not a danger" to her daughters. Respondent acknowledged "she ha[d] behaved in ways that are very uncharacteristic for her out of the extreme pain, fear, and anxiety she suffered" and indicated she "regret[ted] [her behavior] tremendously." She also set forth allegations concerning her efforts in counseling and in completing various assessments and evaluations. Amongst these allegations, respondent placed blame for her circumstances with the alleged malicious or substandard acts of petitioner, petitioner's counsel,

the GALs assigned to the case, and the circuit court.

¶ 11    D. Hearing on the 2024 Motion to Modify Parenting Time Restrictions

¶ 12    In November 2024, the circuit court, the Honorable Donald P. Shriver presiding, held a two-day hearing on respondent's motion to modify parenting time restrictions. As indicated, respondent represented herself at the hearing.

¶ 13    1. *Applicable Statute*

¶ 14    At one point during the hearing, respondent directed the circuit court to the applicable statute, noting: "My point is that my restrictions were under [section] 603.10 requiring a change in circumstances." Petitioner's counsel, in response, agreed it was for the court to determine "whether or not pursuant to [section] 603.10, a change in circumstances" "warrants a removal of the restrictions." The court ultimately indicated it would "make the determination whether or not the supervision restriction should be lifted pursuant to the statute."

¶ 15    2. *Renae Johnson*

¶ 16    Renae Johnson, who had a master's degree in applied family and child studies with a specialization in marriage and family therapy and who was employed at KP Counseling as a licensed marriage and family therapist, testified she began counseling respondent in November 2023. In total, Johnson had 11 sessions with respondent. At the sessions, they would discuss how to (1) cope with the stress of going through the legal proceedings, (2) work through past behaviors, and (3) better respondent's relationship with her daughters.

¶ 17    Johnson described respondent as "[f]ully engaged" and "emotionally stable" during the therapy process. When asked about the positive behaviors she observed from respondent, Johnson answered: "Ability to cope with high levels of ongoing long-term stress, love, care, and concern for your children, ability to have balance in all areas of life." Johnson testified she

- 10 -

observed these behaviors throughout the counseling sessions. When later asked to elaborate on some of the positive behaviors seen of respondent, Johnson testified:

> "[Respondent has] discussed and displayed specific ways that [she] cope[s] with, again, long-term stress very well to be able to function, find balance in all areas of life. [Respondent has] discussed and displayed remorse for past mistakes from years ago, things [she has] learned. Respondent express[es] and show[s] great concern and care for [her] children through [her] own words and actions that [she has] discussed."

Johnson acknowledged respondent had provided her with copies of completed assessments and evaluations, including a psychiatric evaluation, anger assessment, and drug and alcohol assessment, and none of them required treatment.

¶ 18    Johnson testified she had reviewed the 2019 and 2020 decisions of the circuit court. When asked about the specific behaviors that were deemed problematic by the court, Johnson testified: "Some that I recall would be getting upset in front of the kids, maybe, or, you know, difficulties in communication. I can't recall specifics at the moment, you know, from what I read." When later again asked about the behaviors, Johnson indicated she did not remember the specifics, but they involved respondent "getting upset" with petitioner in the presence of their daughters. Johnson testified she did not observe respondent display any of the behaviors the court was concerned about during the counseling sessions.

¶ 19    Johnson believed the behaviors the circuit court was previously concerned about had been sufficiently addressed through counseling and the court should not be concerned about those behaviors repeating. Johnson further believed additional therapy was not "[n]ecessary" but would be "[b]eneficial." When asked to state some of her observations of respondent that

supported her beliefs, Johnson replied:

> "[Respondent has] expressed a thorough understanding of some of the problematic behaviors from several years ago. There have been no reports I'm aware of of any continued mistakes or behaviors such as those. [Respondent] displayed, again, solid concern for [her] relationship with the kids and, you know, ability to cope with stress."

Johnson also testified:

> "[Respondent has] discussed having positive interactions with [her daughters] during [her] visits. [Respondent has] expressed a thorough understanding of not discussing the court matters with them. [Respondent has] expressed putting *** [her] relationship with them above [her] own, you know, feelings or worries at times."

¶ 20       On cross-examination, Johnson testified approximately nine of the counseling sessions with respondent occurred between November 2023 and February 2024. She also testified they had a session in both September and November 2024.

¶ 21       Johnson acknowledged she first reviewed the 2019 and 2020 decisions of the circuit court after a June 2024 deposition. Johnson again could not recall the specific behaviors or conduct that were deemed problematic by the court. She believed the behaviors involved respondent becoming upset with petitioner in the presence of their daughters, which occurred through texts, calls, and in-person.

¶ 22       When Johnson was asked about "hundreds" of harassing text messages sent by respondent to petitioner, respondent interrupted the examination, indicating that she did not believe there were hundreds and that there had been no order of protection since 2021. Johnson, following

respondent's interruption, stated she did not recall hearing about an order of protection against respondent but maintained, even if such an order was entered, it would not change her opinion.

¶ 23 When Johnson was asked if respondent admitted to physically abusing petitioner, respondent objected, asserting she had not physically abused petitioner. Over respondent's objection, Johnson testified she did not recall respondent admitting to such abuse. When Johnson was asked if respondent admitted to physically abusing the paternal grandfather, respondent objected, asserting she was found not guilty. Over respondent's objection, Johnson testified respondent did not admit to such conduct.

¶ 24 Johnson agreed a factor "to predict whether or not a behavior will reoccur is for that person to take accountability for that behavior." Johnson also acknowledged her opinion was based, in part, upon the information respondent had provided to her during the counseling sessions. Johnson did not know the names of respondent's daughters, nor had she met them.

¶ 25 Johnson ultimately maintained:

> "None of the past concerns give me pause—I believe you said. And I do support my opinion that I don't see any reason that supervision would continue. I can't state about the kids at all, but in my observation of [respondent], I don't see any reason that they're there."

As for the daughters, Johnson acknowledged she "cannot say what is in the best interest of the children."

¶ 26                                    3. *Steve Baxter*

¶ 27 Steve Baxter, who has an adult child with respondent, testified respondent had been positive and cooperative in coparenting their son over the years. Baxter also indicated he was unaware of any instances when respondent had behavioral issues around their son.

¶ 28                                4. *Patrice Turner*

¶ 29        Patrice Turner, who was a visitation supervisor and police officer, testified she supervised visitations between respondent and her daughters for approximately six years. Respondent's parenting time typically consisted of every weekend, for about two to three hours per session.

¶ 30        When asked how she would describe the nature of respondent's interactions with her daughters, Turner stated:

> "I'd say it's a typical *** mother-daughter relationship. [Respondent] and [her] daughter seem to speak freely about most topics. Actually, [respondent] speak[s] pretty freely about everything, you know, as far as I can tell. [Respondent] talk[s] about things such as crushes, who has a crush on who, dating relationships, what should you do if a friend is drinking? You know, all different age-appropriate conversations."

When further asked if she has observed any behaviors suggestive of a positive and supportive relationship between respondent and her daughters, Turner stated:

> "Positive interactions. Let's see. I will say that I noticed now how the girls, mostly [M.G.], but I've seen both of them do it—will pause before they leave to get a hug from [respondent]. In the beginning and prior years when I first came around, [respondent] would have to ask them for a hug before they left, and then they would turn to hug [her]. Now they pause at the door. I always allow them to walk ahead of me. They are the ones that approach the door. They either knock or ring the doorbell, which tells me that they don't mind being there. Typically, children who don't want to be somewhere walk behind me and I have to ring the

doorbell or not initiate first contact. So the fact that they walk in front of me tells me that they don't mind being there. Yeah, I just say it's positive interactions. [Respondent] talk[s] very well. [Respondent and the children] are open, [they] think, [they] put things together. I've seen [them] play games together, watch movies together, fix things together or screwdriver work, as [S.G.] calls it. I've seen mostly positive interactions."

¶ 31 Turner testified she had observed improvements in respondent's behavior. Turner had not heard any inappropriate conversations with her daughters in the last few years. When asked if she had any concerns that respondent would display negative behaviors if a supervisor was not present, Turner testified:

"I know the girls are much older. The relationship between [respondent] has changed from *** when I first began there. They were little girls when I started, and now one of them is nearly an adult. So I don't *** fear that there would be any issues like that. And to be honest, if there were, they have cell phones. They could call, they could leave, but I don't believe that they would."

Turner further testified the girls did not appear to have any safety concerns while in respondent's presence. Turner ultimately believed her supervision services were no longer necessary.

¶ 32 On cross-examination, Turner, when asked if respondent had made comments about petitioner's current wife to the girls in the last three years, stated, "I've heard her mention [the name of petitioner's wife] a few times, not negative comments." When asked if respondent had made comments about petitioner's parents being alcoholics in the last three years, Turner stated:

"Not in that way. One time, [M.G.] was mentioning, and actually, I

mentioned this in the email to *** Maureen Lawson as well. One time [M.G.] was mentioning that she doesn't understand alcoholism, and she feels bad for her friends who have parents that are alcoholics. And [respondent] asked [M.G.], does your grandfather still drink a lot? So she didn't say directly he's an alcoholic, but she did ask, does your grandfather still drink a lot?"

¶ 33                                    5. *Maureen Lawson*

¶ 34        Maureen Lawson, who had been appointed as a GAL in this case since November 2021, presented a recommendation to the circuit court concerning respondent's motion to modify parenting time restrictions. Her recommendation was based upon meeting with the parties' daughters on October 30, 2024, and reviewing (1) respondent's counseling records with Johnson, (2) e-mail communications with Turner, and (3) a 2022 incident. Her recommendation was also based upon her consideration of the testimony presented at the hearing.

¶ 35        Lawson explained she met with the parties' daughters in December 2021 and in December 2022, twice in 2023, and on October 30, 2024. At the time of the October 30, 2024, meeting, the girls were 17 and 13 years old. Lawson testified the girls reported respondent "often does talk disparagingly still about [petitioner] and his wife and his stepchildren and other relatives." Lawson also testified the girls reported they did not want (1) unsupervised parenting time with respondent, (2) additional parenting time with respondent, or (3) counseling. Lawson explained:

> "I think that they feel that they have always expressed that they love [respondent], and I think they feel safe with Patrice Turner there. That's what they tell me. [M.G.] feels that she is better able to stand up to [respondent] when [she] say[s] things that are inappropriate. She *** kind of really feels like she doesn't want to go to the

- 16 -

visits at all, but that she does that to kind of to protect her sister. She feels like that she does—both of them have talked about. They feel that their relationship with [respondent] has improved and that there are things they feel that they can talk to [her] about now that they weren't able to talk to [her] about before. You know, specifically, like Patrice, I don't want to get into the children's business. I think that they both still, though, have a lot of concern that if Patrice were not there, that [respondent] would use [her] parenting time to try to alienate them from [petitioner] by saying bad things about him and trying to say bad things about his family and that. But they also feel *** that this litigation has really hurt them and that this, that *** [respondent is] very litigious and that that hurts them."

Lawson, after an interruption by respondent, continued explaining as follows:

"In the past, they've seen things that [respondent had] posted that they feel are hurtful in relation to saying that [petitioner's] alienating, that this is all caused by parent alienation, blaming [petitioner]. When they feel that it was the things that [respondent] did to them that were hurtful. They worry that *** [respondent] did these things, and [she has] never apologized to them about it in the sense of where they feel. You know, they just feel like [respondent] kind of still blame[s] their dad. And I think maybe that's why *** they want the period time to stay supervised."

¶ 36    Lawson testified her review of the counseling records did not show respondent had (1) "discussed actual instances and things that [respondent] did that were emotionally damaging to the children" and (2) taken accountability for her conduct.

¶ 37    Lawson indicated she was concerned with the comments reported by Turner about respondent commenting on the paternal grandfather's drinking to M.G. Lawson acknowledged

supervised visitations otherwise went well.

¶ 38      Lawson described an incident in December 2022 when respondent posted a recommendation from Lawson on social media. Lawson explained respondent then made a similar post after she was informed not to do so. During Lawson's testimony about this incident, respondent inquired about the privacy of her social media, at which point the circuit court asked respondent if she had posted the recommendation, to which respondent stated, "No, I did not post her recommendations verbatim."

¶ 39      Lawson ultimately recommended respondent's parenting time remain supervised. She did not believe respondent had shown an understanding of how her behaviors affected her daughters. Lawson also recommended continued individual counseling for respondent, followed by reunification counseling with respondent and her daughters to address the reasons why the daughters did not want unsupervised and additional parenting time with respondent. Lawson noted respondent and her daughters previously participated in reunification counseling, but it was terminated after a recommendation was made for respondent to participate in individual counseling to address taking accountability for her actions that caused the breakdown in the parent-child relationship.

¶ 40                  6. *In Camera Examination*

¶ 41      Before the close of the evidence, the circuit court offered to do an *in camera* examination of the parties' daughters. While petitioner supported the examination, respondent objected, noting her belief the girls did not feel they could express their views out of fear of petitioner. Petitioner's attorney, in response, represented that the girls had expressed a desire to speak to the court. Respondent maintained her objection, believing the examination would cause the girls undue stress. Without an agreement, the court declined to examine the girls.

¶ 42        E. Decision on the Motion to Modify Parenting Time Restrictions

¶ 43        After taking the matter under advisement, the circuit court issued a three-page written decision denying respondent's motion to modify parenting time restrictions. The court provided the following explanation for its decision:

"Renae Johnson of KP Counseling provided an opinion that past conduct that led to the restriction would not occur in the future if that restriction was lifted. Unfortunately, Ms. Johnson appears to have developed that opinion in a vacuum. She did not review the court's July 24, 2019[,] and January 17, 2020[,] decisions until after her deposition, and more importantly, until after her opinion was disclosed. Ms. Johnson was unable to recite in any substantive details about the behaviors exhibited by [respondent] throughout the history of this case, and as thoroughly detailed in those two court memorandums. Further, it is apparent Ms. Johnson has no knowledge of the detailed findings made by the court concerning [respondent's] behavior in 2018[-]OP[-]508, Plenary Order filed July 2, 2019.

For instance, Ms. Johnson opined that her therapy sessions focused on coping mechanisms. However, the January 17, 2020 memorandum [citation] refers to [']cognitive behavioral therapy *** coping mechanisms. But my concern is that if there's no accountability or, or hardly any accountability' this makes the court 'skeptical' of lifting the restriction.

[Respondent's] conduct during the recent hearing highlights the court's skepticism. When the [GAL] asked Ms. Johnson about any knowledge of [respondent's] criminal charge for battery, [respondent] (again) interrupted the question exclaiming she was found 'not guilty'. While this is true as to the criminal

case, it is contrary to the law of this case:

> 'The court finds by a preponderance of the evidence that [on] March 24, 2018, Ms. Garnhart assaulted the girls grandfather ***, and that she also harassed and interfered with [petitioner's] personal liberties.' [Citation.]

[Respondent] did not reveal this incident to Ms. Johnson, and clearly, to this day, takes no responsibility for her conduct. Further, it is evident that Ms. Johnson was provided a skewed and glossed-over history. The basis for her opinion is unconvincing, given the minimal information provided to her or that she could recall on the stand.

Patrice Turner, the supervisor of mom's parenting time, provided a great deal of encouragement to the court. Her testimony regarding [respondent's] interactions were almost universally positive, and she had no concerns about lifting the supervision restriction. That Ms. Turner has seen such positive development in [respondent's] behavior over the years is wonderful for both [respondent] and the girls. However, if Ms. Turner is a catalyst to appropriate parenting time, and a calming and reassuring influence on how the girls interact with [respondent], her removal could, and likely will, create undue stress on the children. The [GAL] revealed that the girls do *not* want the restriction removed, which reveals that Ms. Turner's continued supervision provides safety, stability, and support for the girls during their time with [respondent].

Ultimately, if the supervised parenting time restriction were to be lifted, the best interests of the children requires answers to a number of questions. Will [respondent]

- thwart [petitioner's] parenting time?

- interfere with [petitioner's] visitation time?

- make false claims about [petitioner] in the presence of the children?

- attempt to alienate the children from [petitioner]?

- engage in hysterical behavior before, during, or after transitions?

- disparage [petitioner] or his family in the presence of the children?

- cause undue stress on the children through erratic or volatile behavior?

- act in a manner that endangers the mental, moral, or physical health of the children?

These questions are all based on conduct that has previously been discussed in this case. Ms. Johnson answered none of these questions to the court's satisfaction. Further, if Ms. Johnson was unaware of [respondent's] prior conduct, the court cannot accept her opinion that the conduct will not reoccur. Simply put, [respondent], to this day, denies responsibility for the restriction. She often blames the court, or the [GAL], or Attorney Kim, or [petitioner] for the situation.

'It is unequivocally clear to the court that [respondent] is *** unwilling to acknowledge, or for reasons currently unknown to the court is unwilling to appreciate and accept, that it is her conduct that has led to the supervised parenting time restriction currently in place.' [Citation.]

'[It cannot be denied that the high level of conflict [respondent] injected over time is materially detrimental to the parties and, more

importantly, the best interests of the parties' daughters.' [Citation.]

When the [GAL] discussed how her recommendations and communications with [respondent] were inappropriately disclosed on social media in December of 2022, [respondent] again shifted the blame. Instead of acknowledging that she had, or had someone on her behalf, make those posts she questioned the [GAL's] 'methods' of discovering those 'private' posts.

This judge cannot recall one hearing with [respondent] where she did not interrupt someone or talk over someone despite the court's repeated admonishments not to do so. If [respondent] cannot conduct herself without volatility and with civility during court, there is no assurance she will not similarly act while alone with the girls.

As the court stated in its January 17, 2020[,] ruling [citation], [respondent's] counselor/therapist opinion has to convince the court that she accepts and understands her responsibility in the implementation of the restriction. As evidenced by her testimony, questions, and outbursts during this hearing, she clearly has not done so. Ms. Johnson's opinion bears little weight, given the dearth of information provided to, or recited by her. Further, given the age and maturity of the girls, the court is reluctant to lift the restriction given their continued request for supervised parenting time with [respondent]. Their well-being is the court's primary concern, and they apparently have the same reservations about lifting the restriction as the court, the [GAL] and [petitioner]."(Emphasis in original.)

¶ 44    This appeal followed.

¶ 45                              II. ANALYSIS

¶ 46        On appeal, respondent argues the circuit court erred when it (1) failed to reference the relevant statute and the factors set forth therein in its written decision, (2) allowed a perceived lack of accountability to set the legal standard, (3) considered her daughters' wishes to have the supervised parenting time remain in effect, (4) considered her successful supervised parenting time as a basis to keep supervision in place, (5) discredited the testimony of Johnson, (6) found a "nexus" between her in-court conduct and her relationship with her daughters, and (7) found the evidence presented did not support a modification. While petitioner has not filed a brief responding to respondent's arguments, we find that does not serve as an impediment to our review of the merits of this appeal. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 47                        A. Timeliness of Decision

¶ 48        This appeal has been designated as accelerated pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018). Rule 311(a)(5) states, in relevant part, "Except for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, respondent filed two motions for an extension of time to file a brief, both of which we granted, and a motion to file a late brief, which we also granted. The delays caused by respondent contributed to this court not reaching a decision until after the 150-day deadline had passed. Under these circumstances, we find the existence of good cause for the late decision.

¶ 49                        B. Issue of Mootness

¶ 50        "When intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party [citation], then the appeal, and issues therein, are considered moot." (Internal quotation marks omitted.) *Felzak v. Hruby*, 226 Ill. 2d 382, 392 (2007).

In this case, M.G. turned 18 years old one week after the filing of respondent's brief. Having reached the age of majority, M.G. can choose to visit with respondent with or without supervision, and it would be impossible for this court to grant respondent effectual relief as it relates to M.G. See, *e.g.*, *In re Marriage of Auriemma*, 271 Ill. App. 3d 68, 72 (1994). This appeal, therefore, is moot as it relates to M.G. A justiciable issue remains, however, as it relates to S.G., who is still a minor. Accordingly, we will consider whether respondent has shown any error with respect to the circuit court's denial of her motion to modify the order restricting parenting time as it relates to S.G.

¶ 51                                    C. Applicable Standards of Review

¶ 52          The circuit court denied respondent's motion to modify parenting time restrictions after a hearing where respondent represented herself and the court heard live testimony from multiple witnesses. Respondent, on appeal, argues the court committed a series of errors in reaching its decision. She asserts the court's decision to deny her motion should be reviewed under the manifest-weight-of-the-evidence standard.

¶ 53          The arguments presented by respondent in this appeal raise multiple questions, each of which is subject to a separate standard of review. As our supreme court has explained:

> "[A] standard of review applies to an individual issue, not to an entire appeal. Each question raised in an appeal is subject to its own standard of review. Thus, under [Illinois] Supreme Court Rule 341[(h)(3) (eff. Oct. 1, 2020)], the appellant is required to provide not only a statement of the issue or issues presented for review, but also a concise statement of the applicable standard of review for each issue, with citation to authority." (Internal quotation marks omitted.) *Redmond v. Socha*, 216 Ill. 2d 622, 633 (2005).

¶ 54    Respondent's arguments raise questions of law: (1) whether the circuit court was required to reference the relevant statute and the factors set forth therein in its written decision; (2) whether the court applied the correct legal standard; and (3) whether the court based its decision on statutorily prohibited factors. These questions of law are subject to *de novo* review, meaning we accord no deference to the circuit court. *People v. Morgan*, 2025 IL 130626, ¶ 22.

¶ 55    Respondent's arguments also raise questions of fact: (1) whether the circuit court unreasonably discredited the testimony of Johnson; (2) whether the court unreasonably found respondent's conduct in court was relevant to the issue before it; and (3) whether the court unreasonably found the evidence presented did not support a modification. These questions of fact, again resolved following a hearing where respondent represented herself and the court heard live testimony from multiple witnesses, are subject to review under the manifest-weight-of-the-evidence standard, meaning we will not reverse the court's findings unless "the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *Andrew W. Levenfeld & Associates, Ltd. v. O'Brien*, 2024 IL 129599, ¶ 56.

¶ 56                          D. Relevant Statute

¶ 57    In 2019, respondent's parenting time was restricted pursuant to section 603.10(a) of the Act (750 ILCS 5/603.10(a) (West 2018)). Section 603.10(a) allows for the restriction of parental responsibilities due to a parent's conduct. See *Mayes*, 2018 IL App (4th) 180149, ¶ 55. It states:

>   "(a) After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional

development, the court shall enter orders as necessary to protect the child." 750 ILCS 5/603.10(a) (West 2018).

Orders necessary to protect a child include orders of supervision. *Id.* § 603.10(a)(2).

¶ 58 In 2024, respondent moved to modify the parenting time restrictions imposed against her, specifically, the restriction that her parenting time be supervised. Section 603.10(b) of the Act (750 ILCS 5/603.10(b) (West 2022)) addresses the modification of orders restricting parental responsibilities due to a parent's conduct. See, *e.g.*, *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶ 47; *In re Marriage of Gorr*, 2024 IL App (3d) 230412, ¶ 37. It states:

"(b) The court may modify an order restricting parental responsibilities if, after a hearing, the court finds by a preponderance of the evidence that a modification is in the child's best interests based on (i) a change of circumstances that occurred after the entry of an order restricting parental responsibilities; or (ii) conduct of which the court was previously unaware that seriously endangers the child. In determining whether to modify an order under this subsection, the court must consider factors that include, but need not be limited to, the following:

(1) abuse, neglect, or abandonment of the child;

(2) abusing or allowing abuse of another person that had an impact upon the child;

(3) use of drugs, alcohol, or any other substance in a way that interferes with the parent's ability to perform caretaking functions with respect to the child; and

(4) persistent continuing interference with the other parent's access to the child, except for actions taken with a reasonable, good-faith belief that they are necessary to protect the child's safety pending adjudication of the facts underlying

that belief, provided that the interfering parent initiates a proceeding to determine those facts as soon as practicable." 750 ILCS 5/603.10(b) (West 2022).

¶ 59                                            E. Questions of Law

¶ 60        We begin with the questions of law raised by respondent. First, respondent argues the circuit court erred when it failed to reference section 603.10(b) and the factors set forth therein in its written decision. We find no error. *Sadler v. Pulliam*, 2022 IL App (5th) 220213, upon which respondent relies, does not support the proposition that a court is required to reference section 603.10(b) and the factors set forth therein in a written decision. *Sadler* involved an appeal from a judgment allocating parental responsibilities, not an appeal from a judgment denying a motion to modify parenting time restrictions under section 603.10(b). *Id.* ¶ 41. Moreover, in *Sadler*, the appellate court reversed where the lower court's decision "seemed to focus" on issues unrelated to the allocation of parental responsibilities and then concluded with the court "merely" stating, " '[B]ased upon all that I've heard, I do believe it is in the best interest of the child to have a meaningful relationship with both parents.' " *Id.* ¶¶ 44-45. *Sadler* simply does not support respondent's argument that the circuit court committed error by not explicitly referencing section 603.10(b) and the factors set forth therein in its written decision, and respondent advances no other grounds to support her argument.

¶ 61        Next, respondent argues the circuit court erred when it allowed a perceived lack of accountability to set the legal standard. Specifically, respondent asserts the court used accountability to set the legal standard to the exclusion of the standard set forth in section 603.10(b). We find no error. We begin with the presumption the circuit court knew and followed the law. *In re Commitment of Snapp*, 2021 IL 126176, ¶ 22. This presumption is, furthermore, supported by the discussion about the applicable statute during the hearing on respondent's motion.

- 27 -

While the court found respondent had not shown accountability for her past conduct, the court's finding is better characterized as a factor which it considered in determining whether respondent had shown a modification would be in her daughters' best interests based upon a change in circumstances, the applicable legal standard under section 603.10(b). See 750 ILCS 5/603.10(b) (West 2022). Respondent has not shown the court applied an incorrect legal standard.

¶ 62        Third, respondent argues the circuit court erred when it considered her daughters' wishes to have the supervised parenting time remain in effect. Specifically, respondent asserts a child's wishes is not a factor listed in section 603.10(b) and, therefore, this court should presume the legislature did not intend for it to be a factor for consideration. We find no error. Section 603.10(b) plainly provides a nonexhaustive list of factors for a court to consider in determining whether to modify an order restricting parental responsibilities. See *id.* ("[T]he court must consider factors that include, but need not be limited to, the following."). Accordingly, the omission of a child's wishes from the list of factors to be considered is not determinative, and respondent advances no other grounds to find a court is prohibited from considering a child's wishes under section 603.10(b).

¶ 63        And last, respondent argues the circuit court erred when it considered her successful supervised parenting time as a basis to keep supervision in place. We find no error. Our review of the court's decision to deny respondent's motion does not show it was based upon respondent's successful supervised parenting time. In its decision, the court, upon discrediting Johnson's testimony and emphasizing respondent's in-court conduct, found respondent had not shown her past conduct that led to the restrictions would not occur if supervision was lifted. In reaching its finding, the court credited the fact Turner had "seen such positive development in [respondent's] behavior over the years," which it noted was "wonderful for both [respondent] and the girls." The

court also credited the fact the girls had conveyed to Lawson they did not want supervision removed. The court inferred supervision provided the girls with safety, stability, and support and its removal would cause undue stress. This inference, considered in its context, does not show the court's decision to deny respondent's motion was based upon respondent's successful parenting time.

¶ 64                                F. Questions of Fact

¶ 65        We turn next to the questions of fact raised by respondent. First, respondent argues the circuit court erred when it discredited the testimony of Johnson. Specifically, respondent asserts the court should not have discredited Johnson based upon her forming an opinion before reviewing the court's decisions because Johnson testified her opinion did not change after she reviewed the decisions. Respondent also asserts—in a footnote—the court should not have discredited Johnson based upon the fact she, "a likely nervous" witness, did not have "a photographic memory" to "pass what amounts to a pop quiz" on the court's decisions. We find no error. While Johnson maintained her opinion did not change after reviewing the court's decisions, we find the court could reasonably discount her opinion based upon the fact it was offered before she had reviewed the decisions. Likewise, where Johnson offered an opinion as to whether past conduct would reoccur if supervision was lifted, we find the court could reasonably discount her testimony if she could not recall the specific conduct which respondent previously committed. Ultimately, we cannot say the grounds upon which the court discredited Johnson's testimony, or more specifically her opinion, were unreasonable.

¶ 66        Next, respondent argues the circuit court erred when it found a "nexus" between her in-court conduct and her relationship with her daughters. We find no error. Respondent's parental responsibilities were restricted, in part, due to concerns about her volatility and the impact

it had on her daughters. While Johnson offered an opinion based upon respondent's progress in counseling that respondent's past conduct would not reoccur if supervision was lifted, the court discredited that opinion and found its skepticism was supported by respondent's in-court conduct. Contrary to respondent's suggestion, we find the court could reasonably find her in-court conduct was relevant when deciding whether there had been a change of circumstances to justify modifying the order of supervision.

¶ 67　　　　　　And last, respondent argues the circuit court erred when it found the evidence presented did not support a modification. Respondent emphasizes the evidence showed (1) Johnson opined respondent's past conduct would not reoccur if supervision was lifted, (2) Turner did not believe her supervision services were necessary, (3) respondent made progress in counseling, (4) six years had passed since supervision was ordered, (5) respondent completed the recommended assessments and evaluations, and (6) the statutory factors were not applicable. We find no error. As indicated, the court reasonably discredited Johnson's opinion, and the evidence otherwise fails to show respondent had sufficiently addressed her past conduct and understood the effects it had on her daughters. As even Johnson acknowledged, a factor "to predict whether or not a behavior will reoccur is for that person to take accountability for that behavior." Given the evidence presented, we find the court could reasonably find respondent had not met her burden to support a modification of the restriction to her parenting time.

¶ 68　　　　　　　　　　　　　　G. Final Comments

¶ 69　　　　　　Before concluding, we commend the circuit court for its careful handling of this matter and for its detailed written decision, which we found helpful in our resolution of this appeal. We encourage respondent to continue her efforts in counseling. She should ensure her counselor has a copy of the circuit court's prior decisions or, at a minimum, this decision. We also encourage

respondent to continue her efforts during supervised visits with S.G. Respondent should know, while she was unsuccessful in this appeal, she has received zealous representation from her counsel. Finally, we remind the parties, both respondent and petitioner, the best interests of their daughters should be at the forefront of any of their decisions.

¶ 70                                    III. CONCLUSION

¶ 71            For the reasons stated, we affirm the circuit court's judgment.

¶ 72            Affirmed.